661 So.2d 774 (1994)
Ricky HOPKINS
v.
STATE.
No. CR 93-985.
Court of Criminal Appeals of Alabama.
September 30, 1994.
Opinion Extended on Rehearing December 29, 1994.
Certiorari Denied May 5, 1995.
*775 James Byrd, Mobile, for appellant.
James H. Evans, Atty. Gen., and Tracy Daniel, Asst. Atty. Gen., for appellee.
Alabama Supreme Court 1940509.
BOWEN, Presiding Judge.
Ricky Hopkins, the appellant, pleaded guilty to, and was convicted of, the unlawful possession of cocaine. He was sentenced to five years' imprisonment. This sentence was "split" and he was ordered to serve six months' in incarceration and the balance of the sentence on probation. In pleading guilty, the appellant reserved the right to appeal the issue of the trial court's denial of his motion to suppress, in which he asserted that the cocaine was illegally seized. We *776 conclude that the appellant's motion to suppress was due to be granted.
The record on appeal does not contain a transcript of the guilty plea proceedings, which were had in circuit court. Although a written motion to suppress was filed in circuit court, there is no indication that an evidentiary hearing was held on that motion. A copy of the transcript of a suppression hearing held in district court was filed as an exhibit to the motion to suppress filed in circuit court.
The testimony adduced at the hearing on the appellant's motion to suppress held in district court is as follows. Mobile County Deputy Sheriff Lawrence Battiste IV was the only witness to testify. He related the following information. On the evening of December 23, 1992, Battiste and a number of other deputies were working in the Orange Grove housing projects. He observed the appellant and Michael Thomas "standing near a vehicle in the parking lot" in an area "consider[ed] a high drug area in the housing project." R. 65.
Battiste testified:
"We pulled in; we were in an unmarked vehicle. Mr. Thomas and Mr. Hopkins began to walk off at a very rapid rate. Myself and Deputy Dinkins were in a vehicle together. We pulled our vehicle up, we stopped, we began to exit our vehicle. As we exited our vehicle Deputy Dinkins shouted and asked the two subjects to stop. They continued to move on. As we exited the vehicle they had got up to the top step at a residence in the area; they were knocking on the door.
"Deputy Dinkins asked them again to stop and [we] identified ourselves as deputy sheriffs. Myself and Deputy Dinkins had on black-gray jackets with `sheriff' [written] across the back and a sheriff's emblem on the front pocket.
"Just as we got to the top step of the apartment that they were knocking on the door, the door opened and Mr. Hopkins and Mr. Thomas entered the apartment. Myself and Deputy Dinkins were behind them. Again, we shouted, `Deputy sheriff.' They went into the apartment. We followed behind. Both myself and Deputy Dinkins' weapons were drawn at that time.
"Mr. Hopkins broke away, ran towards the bathroom. I followed Mr. Hopkins. Mr. Thomas went towards the kitchen. Deputy Dinkins followed Mr. Thomas. Mr. Hopkins went to the bathroom. He had a clear plastic bag of beige rock-like objects, which he dropped into the commode and then attempted to flush down the toilet.
"I stuck my hand in the toilet and attempted to retrieve the substance. As my weapon was drawn Mr. Hopkins grabbed me, we began to struggle. He reached for my weapon and during the struggle my weapon discharged striking Mr. Hopkins in the leg on the inner thigh just above the knee. I retrieved the plastic bag of beige rock-like substance and maintained possession until I turned it into the lab.
"After Mr. Hopkins was wounded he continued to struggle. The door was locked behind us by a third subject by the name of Mr. Geil. After Deputy Dinkins got Mr. Thomas under control he went and unlocked the door. Myself and Mr. Hopkins were still struggling until Corporal McCaskill came to the residence and he had a shotgun which kind of made Mr. Hopkins lay down and comply to what I was asking him to do. Mr. Hopkins and Mr. Thomas both were placed under arrest for possession of a controlled substance; both subjects were also placed under arrest for resisting arrest." R. 65-67.
Battiste testified that he "didn't know what [the appellant] had tried to flush ... until after [he] retrieved it out of the toilet." R. 74. The bag retrieved from the toilet contained 13 grams of cocaine. A plastic bag containing a small amount of beige rock-like substance was retrieved at the entrance to the residence. Battiste testified that "Deputy Dinkins advised me that he observed Mr. Thomas drop that substance at the door as he attempted to enter the door." R. 67. That bag contained 1.7 grams of cocaine.
Battiste testified that "[a]ll we were going to do is ask them for some identification and ask them what they were doing in the area." R. 68. He said that he did not have any *777 knowledge that they were doing anything illegal. R. 68. Battiste testified that his authority for entering the private dwelling was that the officers were in "hot pursuit" because "[w]e advised him to stop; he did not comply." R. 71. Battiste stated that he "was pursuing [the appellant] to get some identification from him" and that he "followed [the appellant] into the house because he did not comply with me asking him to stop and identify himself at the time." R. 71, 72.

I
The prosecution's only argument in its written response to the appellant's motion to suppress filed in circuit court was that the motion was due to be denied on the authority of California v. Hodari D., 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). In that case, the United States Supreme Court held that a seizure does not occur when, without more, a police officer makes a "show of authority" to an individual and the individual fails to yield to the officer's authority. "Thus, a seizure requires either physical control over the suspect, or the suspect must in some form submit to the officer's show of authority." 2 W. Ringel, Searches and Seizures, Arrests and Confessions § 13.2(a)(1) at 13-13 (2d ed. 1994). "[A] police officer who chases a fleeing suspect unsuccessfully has not seized that person." Id. § 13-2(a)(1) at 13-14. Thus, "[e]ven if [the officer's] various decisions to question and follow [the suspect] were unjustified, they did not constitute a `seizure' and, as a result, are not subject to any Fourth Amendment scrutiny." Tom v. Voida, 963 F.2d 952, 956 (7th Cir. 1992).
"To say that an arrest is effected by the slightest application of physical force, despite the arrestee's escape, is not to say that for Fourth Amendment purposes there is a continuing arrest during the period of fugitivity. If, for example, [Officer] Pertoso had laid his hands upon Hodari to arrest him, but Hodari had broken away and had then cast away the cocaine, it would hardly be realistic to say that that disclosure had been made during the course of an arrest. Cf. Thompson v. Whitman, 18 Wall. 457, 471, 21 L.Ed. 897 (1874) (`A seizure is a single act, and not a continuous fact'). The present case, however, is even one step further removed. It does not involve the application of any physical force; Hodari was untouched by Officer Pertoso at the time he discarded the cocaine. His defense relies instead upon the proposition that a seizure occurs `when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.' Terry v. Ohio, 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 1879, n. 16, 20 L.Ed.2d 889 (1968) (emphasis added). Hodari contends (and we accept as true for purposes of this decision) that Pertoso's pursuit qualified as a `show of authority' calling upon Hodari to halt. The narrow question before us is whether, with respect to a show of authority as with respect to application of physical force, a seizure occurs even though the subject does not yield. We hold that it does not.
"The language of the Fourth Amendment, of course, cannot sustain respondent's contention. The word `seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful. (`She seized the purse-snatcher, but he broke out of her grasp.') It does not remotely apply, however, to the prospect of a policeman yelling `Stop, in the name of the law!' at a fleeing form that continues to flee. That is no seizure. Nor can the result respondent wishes to achieve be producedindirectly as it wereby suggesting that Pertoso's uncomplied-with show of authority was a common-law arrest, and then appealing to the principle that all common-law arrests are seizures. An arrest requires either physical force (as described above) or, where that is absent, submission to the assertion of authority.
"....
"In sum, assuming that Pertoso's pursuit in the present case constituted a `show of authority' enjoining Hodari to halt, since Hodari did not comply with that injunction he was not seized until he was tackled. The cocaine abandoned while he was running was in this case not the fruit of a *778 seizure, and his motion to exclude evidence of it was properly denied."
Hodari D., 499 U.S. at 625-26, 629, 111 S.Ct. at 1550-51, 1552 (emphasis in original) (footnote omitted).
Hodari, however, cannot justify the seizure in this case because the seizure occurred after the deputies had pursued the appellant into a residence.
"The home `is accorded the full range of Fourth Amendment protections,' for it is quite clearly a place as to which there exists a justified expectation of privacy against unreasonable intrusion. It is beyond question, therefore, that an unconsented police entry into a residential unit, be it a house or an apartment or a hotel or motel room, constitutes a search within the meaning of Katz v. United States [389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)]."
1 W. LaFave, Search and Seizure § 2.3(b) at 386 (2d ed. 1987) (footnotes omitted).

II
As stated above, the district attorney's only argument before the circuit court was that the motion to suppress was due to be denied on the authority of California v. Hodari D. The district attorney did not contend that the deputies had reasonable suspicion or probable cause to believe that the appellant was engaged in criminal activity. On appeal, the State asserts that the facts that the appellant and Thomas began walking quickly away as the deputies arrived and that they failed to obey the deputies' commands to stop provided "reasonable suspicion" and "probable cause" to believe that they were involved in criminal activity. Appellee's brief at 7-8.
Section 15-5-30, Ala.Code 1975, provides that a law enforcement officer "may stop any person abroad in a public place whom he reasonably suspects is committing, has committed or is about to commit a felony or other public offense and may demand of him his name, address and an explanation of his actions." (Emphasis added.) The statute is a codification of the principles announced in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). See Key v. State, 566 So.2d 251, 252 (Ala.Cr.App.1990).
There is a split of authority on the question whether law enforcement officers who have reasonable grounds for a Terry stop of a suspect in a public place may, in order to effect the stop, pursue a fleeing suspect across the threshold of a private dwelling. Professor LaFave, citing a decision of the District of Columbia Court of Appeals, takes the position that the police may pursue the suspect into private premises.
"A ... question confronted in Edwards v. United States, [364 A.2d 1209 (D.C.App. 1976), affirmed on other grounds, 379 A.2d 976 (D.C.App.1977) (rehearing en banc,)] is whether a police officer who confronts a citizen on a public street, without probable cause to arrest but with grounds to stop, is barred from pursuing that suspect into private premises when he seeks sanctuary there in response to the officer's request to stop. The Edwards court quite logically responded:
"`We are of the opinion that the Supreme Court's recent decision in United States v. Santana, [427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976),] * * * requires a negative answer to this question. * * * We read the gravamen of the Court's holding in Santana to be that when a citizen has knowingly placed himself in a public place and valid police action is commenced in that public place, the citizen cannot thwart that police action by then fleeing into a private place. In the instant case, appellant and his companion were in a public place when Detective Jackson sought to effect a valid Terry stop and appellant then tried to thwart that stop by running into the building adjacent to the street and gaining his apartment before the pursuing policemansix or seven strides behindcould catch him. Given these particular circumstances, we conclude the officers here should not have been forced to simply "shrug [their] shoulders and allow a crime to occur or a criminal to escape."'"
3 LaFave § 9.2(d) at 369 (footnote omitted). Accord United States v. Gomez, 495 F.Supp. 992, 1002 (S.D.N.Y.1979), affirmed, 633 F.2d 999 (2d Cir.1980), cert. denied, 450 U.S. 994, *779 101 S.Ct. 1695, 68 L.Ed.2d 194 (1981); Harbin v. City of Alexandria, 712 F.Supp. 67, 72 (E.D.Va.1989), affirmed, 908 F.2d 967 (4th Cir.1990); People v. Rivera, 233 Ill.App.3d 69, 174 Ill.Dec. 226, 598 N.E.2d 423, 428 (1992); Servis v. Commonwealth, 6 Va.App. 507, 371 S.E.2d 156, 162-63 (1988).
On the other hand, some courts hold that reasonable suspicion alone can never justify the entry of private premises for a Terry detention. See United States v. Tobin, 890 F.2d 319, 327 (11th Cir.1989), vacated, 902 F.2d 821 (11th Cir.), on rehearing, 923 F.2d 1506, 1511 (11th Cir.1990) (en banc) ("[r]easonable suspicion cannot justify the warrantless search of a house"), cert. denied, 502 U.S. 907, 112 S.Ct. 299, 116 L.Ed.2d 243 (1991); State v. Davis, 295 Or. 227, 666 P.2d 802, 812 (1983); State v. Beavers, 859 P.2d 9, 17 (Utah App.1993). These courts rely on the precepts that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," United States v. United States District Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972), that "the Fourth Amendment has drawn a firm line at the entrance to the house[, and that] [a]bsent exigent circumstances, that threshold may not reasonably be crossed without a warrant," Payton v. New York, 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639 (1980). Those authorities further support their conclusion by reference to the rule that the Fourth Amendment prohibits the warrantless entry of a home, even with probable cause, to arrest for a "minor" offense. Welsh v. Wisconsin, 466 U.S. 740, 753, 104 S.Ct. 2091, 2099, 80 L.Ed.2d 732 (1984) (DUI arrest).
However, in this case we need not decide the question whether a warrantless entry into private premises is ever justified by reasonable suspicion because we hold that Officer Battiste did not have even the reasonable suspicion required by Terry to detain the appellant.
In this case, the appellant's actions did not initially arouse the deputy's suspicion. Here, the personal knowledge and experience of Deputy Battiste did not alert him to the possibility that the appellant might have been involved in any criminal activity.
"The experience of the police officer is almost universally cited by courts upholding an investigative stop as a significant factor in finding that reasonable suspicion existed. While many factors which can contribute to a reasonable suspicion of criminal activity are subject to a variety of interpretations, it is the experience of an officer that allows him to bring the factors together into a meaningful whole demonstrating reasonable suspicion of criminal activity.
"....
"... The key element in giving weight to police experience is the officer's ability to articulate the specific facts which, in conjunction with his experience, led him to a reasonable suspicion that criminal activity was afoot."
2 Ringel § 13.4(a) (footnote omitted). Compare 2 Ringel § 13.4(b) at 13-30 ("In other cases, courts have held that officers had a reasonable suspicion of criminal activity based in part upon their observation of the passing of objects between two persons, or the exchange of an object for money.").
However, because the test for determining probable cause is an objective and not a subjective test, this court may "`find probable cause in spite of an officer's judgment that none exists.'" 1 LaFave § 3.2(b) at 568.
"`[T]he mere subjective conclusions of a police officer concerning the existence of probable cause is not binding on this court which must independently scrutinize the objective facts to determine the existence of probable cause. * * * Moreover, since the courts have never hesitated to overrule an officer's determination of probable cause when none exists, consistency suggests that a court may also find probable cause in spite of an officer's judgment that none exists.'"
1 LaFave § 3.2(b) at 568 (quoting United States ex rel. Senk v. Brierley, 381 F.Supp. 447 (M.D.Pa.1974), affirmed, 511 F.2d 1396 (3d Cir.), cert. denied, 423 U.S. 843, 96 S.Ct. 77, 46 L.Ed.2d 63 (1975)). "[T]he fact that the officers did not, believe there was probable cause ... would not foreclose the State from justifying [the defendant's] custody by *780 proving probable cause." Florida v. Royer, 460 U.S. 491, 507, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983). `"Probable cause is measured against an objective standard.... If this objective test is met, it is unnecessary that the officer hold a subjective belief that he has a basis for making the arrest.' United States v. Salinas-Calderon, 728 F.2d 1298, 1300-01 (10th Cir.1984) (citations omitted)." Cox v. State, 489 So.2d 612, 621 (Ala. Cr.App.1985) ("[t]he fact that the Sheriff testified that the defendant was not under arrest or in custody is not conclusive on that issue").
Nevertheless, in this case we agree with the deputy's assessment of his situationthere was no reasonable suspicion or probable cause to stop or arrest the appellant. "While some courts have held that flight at the approach of plainclothes officers in an unmarked car is at most ambiguous, see United States v. Ortega-Serrano, 788 F.2d 299, 302 (5th Cir.1986); United States v. Jones, 619 F.2d 494, 498 (5th Cir.1980), others have concluded that the conduct is not, as a matter of law, suspicious, see People v. Huntsman, 152 Cal.App.3d 1073, 1091, 200 Cal.Rptr. 89, 100-01 (1984)." Darden v. State, 571 So.2d 1272, 1278 (Ala.Cr.App.), cert. denied, 571 So.2d 1280 (Ala.1990).
"While there is some authority to the contrary, the majority view appears to be that, unless coupled with additional and objectively suspicious factors, nervousness in the presence of a police officer and/or failure to make eye contact do not establish reasonable suspicion to believe that the person is engaged in criminal activity."
State v. Washington, 623 So.2d 392, 398 (Ala. Cr.App.1993) (footnote omitted).
"The fact that someone tries to run away does not in and of itself justify a warrantless arrest according to the Alabama cases. Foy v. State, 387 So.2d 321 (Ala.Cr.App. 1980). If there are other circumstances tending to show that a felony has been committed, then, however, the fact of flight may be used to establish probable cause. Foy, supra,"

Harrell v. State, 475 So.2d 650, 652-53 (Ala. Cr.App.1985). Compare Kidd v. State, 398 So.2d 349, 352-53 (Ala.Cr.App.) (probable cause established by informant's tip, officer's observations of defendant's conduct, and defendant's flight), cert. denied, 398 So.2d 353 (Ala.1981), overruled on other grounds, Luker v. State, 424 So.2d 662 (Ala.Cr.App.1982).
In Ex parte Jones, 541 So.2d 1052 (Ala. 1989), the Alabama Supreme Court addressed the issue of the admissibility of evidence of flight when separate offenses are involved:
"One of this Court's first detailed examinations of evidence of flight came in Levison v. State, 54 Ala. 520 (1875); there, this Court stated:
"`Flight, the demeanor when arrested, stolidity or trepidation, under accusation, prevarication in answer to inquiries relating to the offense, or to his conduct, the fabrication or suppression of evidence, or previous threats, or antecedent grudges, are all evidentiary facts against the person to whom they are imputable, dependent for their value on a connection with other criminating circumstances. They are evidence against the party to whom they are imputable, and not constituting the guilty act, only pointing to him as the guilty agent, are not evidence for or against another with whom he has no connection. The most inconclusive of the criminating circumstances, that which, not combined with other factors, is of the least probative force is flight. [Citation omitted.] It may be attributable to fear, or to impatience and restlessness, under the duress of imprisonment, or to a consciousness of guilt. Much depends on the character of the mind, temperament and education. One will, with fortitude, endure imprisonment without murmuring, and without an effort to fly, though tortured with the consciousness of crime; while another of a different mental, or moral, or physical organization, conscious of innocence, fretting under unaccustomed restraints, or fearful of the issue of the events leading to his imprisonment, will fly on the first opportunity. Flight is of consequence, in itself, delusive and inconclusive as a criminating fact.'

*781 "54 Ala. at 527. (Emphasis added.)
"In an even earlier case, this Court did hold, however, that care must be taken in introducing evidence like evidence of flight. In Liles v. State, 30 Ala. 24, 24-25 (1857), this Court stated:
"`In determining how far the conduct of a prisoner may be evidence against him, we feel that we are treading on dangerous and doubtful ground. One of acute sensibilities might be overwhelmed by a simple accusation of crime; while a hardened offender would stand unabashed, and undisturbed in muscle, though conscious of the deepest guilt. A respectable modern writer, speaking of the effect produced by imputation of crime, uses the language, that "it is an impulse of nature, consequent upon extreme surprise, to which the innocent may yield as well as the guilty. It may happen that the more innocent the party, the greater the shock occasioned by such a proceeding." Burrill on Cir. Ev., 476-7; Smith v. The State, 9 Ala. 990-5.'
"Alabama cases clearly hold that evidence of flight that is not combined with other criminative circumstances has little probative force. Levison, supra. The teaching of Levison, of course, is that care should be used when evidence of flight is presented....
". . . .
"As Judge Johnson put it in United States v. Borders, 693 F.2d 1318, 1325-26 (11th Cir.1982), cert. denied, 461 U.S. 905, 103 S.Ct. 1875, 76 L.Ed.2d 807 (1983):
"`Human experience teaches, however, that not every act of flight constitutes an expression of guilt.... Thus, the interpretation to be gleaned from an act of flight should be made cautiously and with a sensitivity to the facts of the particular case....'
"....
"The above cases, both from this state and from other jurisdictions, clearly show that flight evidence can become so untrustworthy when there is no evidence that the flight was motivated by the suspect's knowledge of the crime charged that the evidence's probative value is outweighed by the prejudice it produces."
Jones, 541 So.2d at 1053-57.
Furthermore, it appears that the appellant and Thomas were "fleeing" from deputies who were in an unmarked vehicle and who were not in uniform although they were wearing "black-gray jackets with `sheriff [written] across the back and a sheriff's emblem on the front pocket." R. 65. From the testimony it also appears that the deputies first identified themselves as deputies only when the appellant and Thomas "were knocking on the door" of the apartment. R. 65-66.
In a case involving facts raising even more suspicion than those presented here, a majority of this Court held that Terry did not authorize an investigatory stop. State v. Bodereck, 549 So.2d 542, 544 (Ala.Cr.App.1989), dealt with an officer on patrol in an area with a "reputation for extensive drug activity." The officer observed a black male leaning into the passenger side of a parked Cadillac automobile with out-of-state license plates. Two white males were seated in the vehicle. As the officer drove past the car, the black male "duck[ed] behind" the Cadillac. Here, as in Bodereck, neither the reputation of the area nor the evasive action by the suspect was sufficient, singly or in combination, to warrant a Terry stop because the State did not elicit from the officer the particular, objective basis for his suspicion. In both instances, the officers articulated nothing more than "inchoate and unparticularized suspicion[s] or `hunch[es].'" Terry v. Ohio, 392 U.S. at 27, 88 S.Ct. at 1883. Compare United States v. Cortez, 449 U.S. 411, 419, 101 S.Ct. 690, 696, 66 L.Ed.2d 621 (1981) (officers testified to "fact on fact and clue on clue [that] afforded a basis for the[ir] deductions and inferences," all of which "form[ed] a legitimate basis for [their] suspicion" that criminal activity was afoot). A vague hunch is "simply too slender a reed to support the seizure in this case." Reid v. Georgia, 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980).
In Harris v. State, 568 So.2d 421 (Ala.Cr. App.1990), a majority of this Court held that an officer who in the early morning hours *782 observed a vehicle driving slowly through a residential neighborhood that had been the site of recent burglaries did not have the particularized suspicion necessary for a Terry stop.
In State v. Washington, 623 So.2d 392 (Ala.Cr.App.1993), this Court held that a trooper lacked reasonable suspicion to detain the driver of a speeding vehicle after the driver had signed the UTTC. We determined that the trooper had no grounds for further detention or questioning under Terry despite the following facts: the car had been rented by a third person and the rental agreement did not list the accused as an authorized driver; the driver appeared nervous; the driver had a temporary driver's license, temporary out-of-state car tags, and no photographic identification.
The foregoing authorities illustrate that "`the relevant inquiry in evaluating the presence of reasonable suspicion is "`not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of non-criminal acts.'"'" State v. Washington, 623 So.2d at 397 (quoting United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir.1990)) (quoting United States v. Sokolow, 490 U.S. 1, 10, 109 S.Ct. 1581, 1587, 104 L.Ed.2d 1 (1989), and Illinois v. Gates, 462 U.S. 213, 243-44 n. 13, 103 S.Ct. 2317, 2334-35 n. 13, 76 L.Ed.2d 527 (1983)). Whatever degree of suspicion is present must be able to be articulated by the pursuing officer. Here, Deputy Battiste did not state what made him suspicious about the appellant's conduct or why he followed the appellant, other than "to get some identification... because [the appellant] did not comply with [the request] to stop and identify himself." R. 71, 72. Without some degree of articulation of suspicion of criminal activity by the arresting officer, we cannot state as a bright-line rule that the circumstances of a high crime area and flight upon the approach of an unmarked police vehicle provide the officer with sufficient reasonable suspicion to make a Terr-type stop.
Under these circumstances and from the record before this Court, the State has failed to demonstrate that Officer Battiste had reasonable suspicion for detaining the appellant. Although "[w]hile flight is not, in itself, sufficiently indicative of guilt so as to support a finding of probable cause, when the fact of flight is connected with other circumstances, it may supply the necessary quantum of probable cause," Foy v. State, 387 So.2d 321, 325 (Ala.Cr.App.1980), those "other circumstances" simply are not present in this caseor at least the record presented to this Court indicates that they were not. See Harrell v. State, 475 So.2d at 652-53 ("The fact that someone tries to run away does not in and of itself justify a warrantless arrest according to the Alabama cases.... If there are other circumstances tending to show that a felony has been committed, then, however, the fact of flight may be used to establish probable cause."); Kidd v. State, 398 So.2d at 352-53 ("We believe the appellant's flight when he saw the deputy sheriff's car provided the exigent circumstances necessary to justify a warrantless seizure and resulting search of the appellant. Based upon the information the officers had from the informant's tip, plus their own observations of the appellant's conduct at the Barn, any reasonable person would be led to believe the appellant was in possession of marijuana."). Cf. State v. Washington, 623 So.2d at 398 ("While there is some authority to the contrary, the majority view appears to be that, unless coupled with additional and objectively suspicious factors, nervousness in the presence of a police officer and/or failure to make eye contact do not establish reasonable suspicion to believe that the person is engaged in criminal activity.") (footnote omitted). The mere facts that the officers are in a "high crime area" and that individuals flee are simply not enough to justify an investigative stop. See Dixon v. State, 588 So.2d 903, 906 (Ala.1991) ("The fact that an area is known for crime can serve to create a reasonable suspicion. See Lewis v. State, 518 So.2d 214, 217 (Ala.Cr.App.1987). Dixon's deliberately furtive actions and flight at the approach of a police officer `are strong indicia of mens rea, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of the crime, they are proper factors to be considered in the decision to make an arrest.' Molina *783 v. State, 533 So.2d 701, 707 (Ala.Cr.App. 1988), quoting Sibron v. New York, 392 U.S. 40, 66, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968)."), cert. denied, 489 U.S. 1086, 109 S.Ct. 1547, 103 L.Ed.2d 851 (1989); Jones v. State, 616 So.2d 949, 950-51 (Ala.Cr.App. 1993).

III
In the face of a Fourth Amendment challenge, the State has the burden of proving that a warrantless search was reasonable. Ex parte Hergott, 588 So.2d 911, 914 (Ala.1991). However, a defendant claiming "that evidence was seized in violation of the [F]ourth [A]mendment ... bears the burden of demonstrating [that he or she had] a legitimate expectation of privacy in the areas searched. Rakas v. Illinois, 439 U.S. 128, 130 n. 1, 99 S.Ct. 421, 424 n. 1, 58 L.Ed.2d 387, 393 n. 1 (1978)." United States v. Baron-Mantilla, 743 F.2d 868, 870 (11th Cir.1984), quoted in United States v. Eyster, 948 F.2d 1196, 1209 (11th Cir.1991). Accord United States v. Singleton, 987 F.2d 1444, 1447 (9th Cir.1993) (citing United States v. Salvucci, 448 U.S. 83, 95, 100 S.Ct. 2547, 2554-55, 65 L.Ed.2d 619 (1980)). Although the appellant did not demonstrate that the residence was his, or that he otherwise had a legitimate expectation of privacy there, the State did not question the appellant's standing to raise the Fourth Amendment challenge below, and it is therefore precluded from questioning it on appeal. United States v. Dewitt, 946 F.2d 1497, 1499-1500 (10th Cir.1991), cert. denied, 502 U.S. 1118, 112 S.Ct. 1233, 117 L.Ed.2d 467 (1992); Smiley v. State, 606 So.2d 213, 214 n. 1 (Ala.Cr.App. 1992); S.C. v. State, 574 So.2d 1032, 1034 (Ala.Cr.App.1990); Cook v. State, 574 So.2d 905, 908 (Ala.Cr.App.1990).
While the record before us leaves unanswered many questions, this court is not authorized to resolve these questions by remanding for a supplementary hearing. Ex parte Hergott, 588 So.2d at 913-14. Here, as in Hergott, "the State failed to produce sufficient evidence in opposition to the motion to suppress to overcome the presumption of unreasonableness that attached to the warrantless search.... Therefore, the fruits of that search should not have been admitted. [Hopkins] is allowed to withdraw his guilty plea, and the State may proceed to trial. However, the evidence seized incident to the warrantless search ... may not be used against him, because the State, when presented with the opportunity to establish its case against him, failed to do so, and under the Double Jeopardy Clause, the State does not get a second chance." Ex parte Hergott, 588 So.2d at 916. The judgment of the circuit court is reversed, and the cause is remanded for proceedings consistent with this opinion.
REVERSED AND REMANDED.
All Judges concur.

ON REHEARING EX MERO MOTU
BOWEN, Presiding Judge.
This Court unanimously reversed the appellant's guilty plea conviction for the unlawful possession of cocaine. Based upon the record of the testimony and proceedings presented to this Court, this Court held that the police did not have even a reasonable suspicion to detain the appellant and consequently had absolutely no authority to enter the residence of a third party in order to apprehend the appellant.
The State filed a motion to suspend the rules and also requested that it be allowed to supplement the record on appeal. This Court granted that motion and placed this cause on rehearing ex mero motu. Supplements to the record were filed on October 28, 1994, and November 16, 1994. On November 28, 1994, the State filed a motion for the finding of additional facts pursuant to Rule 39(k), A.R.App.P., and its brief in support of rehearing.
The record presently before this Court now contains the actual guilty plea proceedings that occurred on March 1, 1994. See Supp. Record filed October 28, 1994. That record shows that the trial court's ruling on the motion to suppress "was based on the transcript of the preliminary hearing" which was introduced as Court's Exhibit A. R. 12 (Supp. Record filed October 28, 1994). However, that transcript of the preliminary hearing was included in the original record. The *784 supplemental record filed October 28, 1994, adds absolutely no significant fact to the facts originally submitted to this Court.
The supplemental record filed November 16, 1994, contains a transcript of the hearing on the motion to supplement the record held on November 3, 1994. That transcript shows that at the hearing on the motion to supplement the record the assistant district attorney asserted that at the suppression hearing he did challenge the appellant's standing to object to the search of the third party's residence. R. 5-6 (Supp. Record filed November 16, 1994). However, defense counsel disagreed and stated that while the issue of standing was mentioned by the district attorney, "[t]he issue of standing was never raised and never addressed." d. at 6. The trial court could only state: "I remember there being some discussion about it." Id. at 7.
Nothing new has been presented to this Court. The State's motion for the finding of additional facts is denied.
OPINION EXTENDED; RULE 39(k) MOTION DENIED; APPLICATION FOR REHEARING OVERRULED.
All Judges concur.