I was originally assigned this case and, after much deliberation, I drafted the original opinion reversing the appellant's conviction. There were two dissents to that opinion. The State of Alabama filed an application for rehearing and a Rule 39(k), Ala.R.App.P., motion. A question obliquely raised in the State's application for rehearing was one of "seizure" and whether the police had actually "seized" Williams on the day of the incident. Because I did not believe the record had been adequately developed to allow us to appropriately answer that question, I recommended that we deny the State's application for rehearing. Nevertheless, this court granted the application and the case was reassigned.
If the majority chose to dispose of this case based solely on the "seizure" question, I would be less disturbed. My greatest concern is caused by the majority's holding that . . . "even if a seizure had occurred, the trial court properly denied the appellant's motion to suppress because the officers had a reasonable suspicion to stop the appellant."
Before the requirement of reasonable suspicion can be imposed on the police, it must be proved that the appellant was actually seized when he was stopped by the police. I remain personally concerned that we are unduly infringing on a citizen's right to movement[1]. Nevertheless, I understand how the *Page 758 
trial court could or should be affirmed in its denial of the motion to suppress because Williams's confrontation with the police did not amount to a seizure.
The determination of this issue is complicated by the fact that neither the State nor the appellant recognized this issue at trial or on appeal. Consequently, the record was never developed in order to answer the threshold question whether there was an actual seizure of Williams. The questions propounded by both sides focused on whether the police officers had an articulable reasonable suspicion that Williams had committed, or was about to commit, a criminal offense. The test for whether a seizure has occurred has been repeatedly stated by the Supreme Court:
 " 'A person has been seized within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' California v. Hodari D., 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991); Michigan v. Chesternut, 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988); Immigration Naturalization Service v. Delgado, 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984); United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).'
 "The Supreme Court in Hodari D. further defined what constitutes a 'seizure' under the above test. 'In [Hodari D.], the United States Supreme Court held that a seizure does not occur when, without more, a police officer makes a "show of authority" to an individual and the individual fails to yield to the officer's authority.' Hopkins v. State, 661 So.2d 774, 777 (Ala.Cr.App. 1994).
". . . .
 ". . . 'Thus, a seizure requires either physical control over the suspect, or the suspect must in some form submit to the officer's show of authority.' Hopkins, 661 So.2d at 777."
Sawyer v. City of Marion, 666 So.2d 113, 114-15
(Ala.Cr.App. 1995).
The United States Supreme Court in Mendenhall, enumerated the factors a court could use to determine if a citizen's Fourth Amendment rights had been violated.
 "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. See Terry v. Ohio, supra, at 19, n. 16, 88 S.Ct. 1868; Dunaway v. New York, 442 U.S. 200, 207, n. 6, 99 S.Ct. 2248, 60 L.Ed.2d 824 [(1979)]; 3 W. Lafave, Search and Seizure 53-55 (1978). In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person."
United States v. Mendenhall 446 U.S. 544, 553-55,100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (plurality opinion of Stewart, J.) (footnote omitted). In analyzing random police-citizen encounters, courts must pay careful attention to the specific facts in each case. The record in this case simply lacks the necessary detail. Because we are unable to determine from the record whether these circumstances were present when Williams was stopped, I am in agreement that Williams's appeal must fail.[2] *Page 759 
The majority, however, goes further by holding that the police officers had reasonable suspicion to stop Williams. It is this erroneous conclusion that prompts this special writing.
The evidence presented at the suppression hearing was uncontroverted. Officer W.B. Hamil of the Montgomery Police Department testified that on May 15, 1996, at about 5:20 p.m., he and Officer S.D. Lockridge were in a police car patrolling an area where several burglaries had recently been reported. Hamil testified that several houses were under construction in the area. Hamil testified that he saw Williams walking away from the construction area as the patrol car approached Williams. Officers Hamil and Lockridge then detained Williams and performed a "field check" on him. Hamil testified that the field check consisted of asking Williams his name and his date of birth, as well as asking him what he was doing in the area. The officers held Williams so that they could ascertain whether he had any outstanding warrants. During this time the officers discovered, over a police radio, that there were warrants pending for Williams's arrest. After Williams was arrested, the officers performed a pat-down search on him and found crack cocaine in one of his pockets.
Officer Lockridge's testimony as to Williams's field check and subsequent arrest was nearly identical to Officer Hamil's. Officer Lockridge testified that Williams appeared to be nervous and that he started walking in a direction different from the one in which he had been walking as the patrol car approached him.
Both officers testified that before they stopped him they had no reason to believe that Williams had committed a crime. Additionally, neither officer testified that there was any reason to believe that he was preparing to commit a crime when he was stopped. Both officers testified that Williams was walking in a public area. Hamil testified that Williams was stopped only because he was walking through an area where several crimes had been reported. Lockridge cited the same reason for stopping Williams and added that Williams was also stopped because he appeared nervous and because he changed the direction in which he was walking as the patrol car approached.
 "The United States Supreme Court, in Terry v. Ohio, 392 U.S. 1 [88 S.Ct. 1868, 20 L.Ed.2d 889] (1968), held that a police officer may make a brief investigatory stop upon a reasonable suspicion of criminal activity. This court in State v. Bodereck, 549 So.2d 542, 545-46 (Ala.Cr.App. 1989), quoting from United States v. Post, 607 F.2d 847, 850
(9th Cir. 1979), discussed 'reasonable suspicion' as mentioned in Terry and stated:
 " ' "[T]he quantum of cause necessary to justify an investigatory stop is a 'reasonable' or 'founded' suspicion that the person has committed or is about to commit a criminal act. . . . The founded suspicion must arise from specific facts and not inchoate hunches, but the officer is entitled to draw inferences from those facts in light of his experience."
" '. . . .
 " 'Standards of "reasonable suspicion" under Terry, [392 U.S. 1, 88 S.Ct. 1868] were further clarified by the United States Supreme Court in United States v. Cortez, 449 U.S. 411, 421, *Page 760 
[101 S.Ct. 690] S.Ct. 690, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), in which the Court held:
 " ' "Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like 'articulable reasons' and 'founded suspicion' are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances — the whole picture — must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." '
"This court has also written:
 " 'In justifying the particular intrusion, the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. Terry v. Ohio. . . . The appropriate question to ask is ". . . [W]ould the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?". Terry v. Ohio, . . . Daniels v. State, 290 Ala. 316, 276 So.2d 441
(1973).'
Gaskin v. State, 565 So.2d 675, 677 (Ala.Cr.App. 1990) (emphasis in original).
There is substantial caselaw to support a police officer's reasonable suspicion for a stop where the person is detained in an area known to be a high crime area and the person's conduct contributed to the police officer's suspicion that he or she was engaged in criminal conduct. (See United States v.Espinosa, 827 F.2d 604 (9th Cir. 1987) cert. denied,485 U.S. 968, 108 S.Ct. 1243, 99 L.Ed.2d 441 (1988); United States v.Trullo, 809 F.2d 108 (1st Cir.), cert. denied, 482 U.S. 916,107 S.Ct. 3191, 96 L.Ed.2d 679 (1987)). Here, however, other than the fact that Williams changed the direction in which he was walking, there was no evidence that Williams attempted to elude the officers or to conceal anything from them as they approached him. Compare Gaskin v. State, 565 So.2d 675
(Ala.Cr.App. 1990) (where the arresting officer approached the appellant, who was driving a truck in a high-crime area and had stopped to talk to a pedestrian, and the appellant drove off at a lawful speed, facts were insufficient to justify a Terry
stop).
Both officers testified that when they stopped him they did not have reasonable suspicion to believe that Williams was engaged in criminal activity. The only two reasons articulated for the stop were that Williams was in an area where crimes had recently been reported and that Williams appeared to be nervous and changed his direction as the patrol car approached him. Both officers testified that they did not see Williams doing anything unlawful before he was stopped.
Based on the totality of the circumstances, in order to rise to the level of reasonable suspicion, the detaining officers' basis for suspecting Williams of criminal activity must have been particularized and objective. The officers themselves denied that they held such suspicion. I am disturbed that the majority concluded that they did; therefore, I concur in the result only.
[1] Several law review articles have addressed the trend of removing police-citizen encounters from Fourth Amendment Protection. E.g., Tracey Maclin, The Decline of the Right ofLocomotion; The Fourth Amendment of the Streets. 75 Cornell L.Rev. 1258 (1990). Edwin J. Butterfoss, Bright Line Seizures:The Need for Clarity in Determining when Fourth AmendmentActivity Begins. 79 J.Crim.L. Criminology 437 (1988).
[2] This troubling constitutional problem arises out of the necessity of balancing the State's interest in making our streets safe from criminal activity with preventing unnecessary governmental intrusion into the lives of citizens who are not involved in criminal activity. The following excerpt from an article that appeared in the Duquesne Law Review accurately states my concern about random police-citizen encounters involving pedestrians:
 "The consensual encounters remain sufficiently non-coercive and outside the scope of Mendenhall/Royer as long as the citizen cooperates with the police. However, if the citizen refuses to cooperate or wishes to disregard the questioning, he has the constitutional right to do so and the police must disengage the encounter unless the detention can be justified by reasonable suspicion. Herein lies the problem. If the citizen refuses to reply or walks away, the authorities will deem such refusal to cooperate as justification for a prolonged detention. Conversely, if the citizen answers the initial, generalized questions and no suspicion or criminality is exposed, the officer will often escalate the encounter by asking the individual if he would consent to a luggage or body search. In either scenario, the intrusion is escalated without justification.
 "More importantly, in both situations, the citizen is unlikely to feel that he is free to leave given the suddenly accusatory environment. In reality, the citizen's liberty has been restrained and his freedom of movement curtailed. The courts will assert that no seizure has occurred and the police conduct remains outside the scope of the Fourth Amendment. By categorizing the encounter as consensual, the police questioning will not implicate the Mendenhall/Royer reasonable person test and can continue or even escalate without justification. The practical effect of such tactics is the deterioration of the Fourth Amendment and the privacy interest it seeks to protect.
Robert J. Burnett, Random Police-Citizen Encounters: When is aSeizure a Seizure?. 33 Duq. L.Rev. 283, 288-89 (1995). *Page 1139