The State appeals from the trial court's order suppressing evidence a law enforcement officer seized from the vehicle and person of the appellee, Curtis McPherson, during a traffic stop. The appellee filed a pretrial motion to suppress in which he argued that the law enforcement officer detained him for an unreasonable period of time during a traffic stop; that the officer did not have reasonable suspicion to detain him while waiting on a K-9 unit to respond; and that any evidence the officer seized pursuant to the illegal detention should be suppressed. After conducting a hearing, the trial court granted the appellee's suppression motion. This appeal followed.
Trooper Jesse Peoples testified that he had been with the Alabama Department of Public Safety since 1989 and was involved in highway patrol and criminal interdiction; that, shortly after 10:00 a.m. on September 11, 2002, the appellee drove up behind him on I-65 with the headlights on his vehicle on bright; that the appellee changed from the right lane to the left lane without giving a signal; that the appellee passed him and changed from the left lane to the right lane without giving a signal; that he stopped the appellee for making an improper lane change; that he approached the appellee's vehicle, asked the appellee for his driver's license, and told the appellee why he had stopped him; that the appellee gave him his driver's license and told him that he was not thinking; that he asked the appellee to step back to his patrol vehicle; that, as they were sitting in his vehicle and talking, the appellee would not make eye contact with him and kept staring out the front window; that he could see the appellee's carotid pulse, which was exaggerated; that the appellee's voice was cracking and quivering; that, while he was talking to the appellee, he was checking the appellee's driver's license; that the appellee did not have proper insurance; that, at some point, he told the appellee he would write him a warning ticket; that the appellee's level of nervousness did not decrease when he told him he was only getting a warning ticket; that most people become less nervous at that point; that he asked the appellee if he had a gun, and the appellee told him he had one; that he asked the appellee if he had a gun permit, and the appellee gave him a facially valid permit; that he subsequently retrieved the gun from the appellee's vehicle and called it in to find out if it was stolen; that, even after he had retrieved the gun, the appellee's level of nervousness did not decrease; that he asked the appellee if there was anything else in the vehicle; that he asked the appellee if he would mind if he searched the vehicle, and the appellee said, "`I would rather you not'"; that he asked the appellee again, and the appellee said, "`[M]an, you don't understand'"; that, when the appellee said that, his voice was quivering and he was almost to the point of tears; that the appellee did not tell him what he did not understand; that, in fourteen years, he had dealt with thousands of people, and the appellee's level of nervousness was more elevated than that of a normal motorist; that he would not have felt safe returning the gun to the appellee and wanted to alleviate his fears and concerns *Page 450 
before he returned the gun to the appellee; that he then called Chris Brown, a K-9 unit who was in the area, for back-up; and that, during a subsequent search, he found drugs in the glove compartment of the vehicle. (R. 14, 25-26.) Peoples also testified that, at the time he called Brown, he had all of the information he needed to write the warning ticket; that the entire stop lasted between twenty-eight and twenty-nine minutes; that that was normal for the type of stop involved in this case; that he did not let the appellee sign the warning until they went to the Alabama Bureau of Investigation office; and that the appellee was not free to leave because the traffic stop was not completed until after he had been arrested.
Trooper Chris Brown, a K-9 officer with the Alabama Department of Public Safety, testified that, on September 11, 2002, he responded to Peoples' call for back-up; that Peoples told him he needed to use his dog; that he walked his dog around the appellee's vehicle; that the dog alerted on the right rear and left rear doors of the vehicle; that he advised Peoples about the positive response on the vehicle; and that he saw Peoples search the vehicle.
A videotape of the traffic stop was admitted into evidence during the hearing on the appellee's motion to suppress, and we have reviewed it. The appellee was not visible during the majority of the videotape; in fact, the only time the videotape shows the appellee before Brown arrived was when the appellee walked from his vehicle to the patrol vehicle. Also, during much of the videotape, the appellee's voice is barely audible. However, the videotape shows that Peoples initiated the traffic stop at 10:03 a.m.; that, after the appellee stopped, Peoples approached his vehicle, asked him for his driver's license, and asked him to come back to his patrol vehicle; that, at 10:05 a.m., Peoples told the appellee he was going to write him a warning; that Peoples subsequently contacted the dispatcher and gave her the appellee's driver's license and license tag numbers; that, after Peoples received some initial information from the dispatcher, he asked the dispatcher to run some type of a check; that, while waiting for the results of that check, Peoples chatted with the appellee about various subjects; that, at 10:11 a.m., the dispatcher contacted Peoples with more information; that Peoples then commented on the appellee's nervousness and asked the appellee if he had any weapons; that the appellee said he had a gun, and Peoples got the gun out of the appellee's vehicle; that Peoples then asked the appellee if he had anything else in the vehicle, and the appellee said that he did not; that Peoples asked the appellee if he minded if he looked in the vehicle, and the appellee said that there was not anything else in the vehicle; that, at that point, Peoples asked the dispatcher to check the serial number on the gun to find out if it was stolen; that, while waiting for that information, Peoples again asked the appellee if he had a problem with him searching his vehicle, and, after the appellee responded, he commented on the appellee's nervousness; that the appellee, in a highly agitated voice, said that Peoples did not understand; that, at 10:16 a.m., Peoples contacted Brown; that the dispatcher subsequently contacted Peoples, and Peoples again gave her the gun's serial number; that, at 10:17 a.m., the dispatcher told him that the gun was not on file; that, at that point, Peoples asked for the appellee's social security number and height and then asked the appellee to give him his driver's license again; that Peoples told the appellee he needed to get the vehicle identification number for the vehicle; that, at 10:19 a.m., he asked the appellee for his insurance card and discovered that it was expired; that, at 10:22 a.m., *Page 451 
Brown arrived and conducted a walk around of the vehicle with his dog; that, at 10:24 a.m., Brown completed the walk around of the vehicle and told Peoples and the appellee that the dog had given a positive response; and that Peoples then searched the appellee's vehicle.
The State argues that the trial court erroneously granted the appellee's motion to suppress. Specifically, it contends that Peoples lawfully detained the appellee while waiting for Brown to respond because Peoples had reasonable suspicion that criminal activity was afoot. Because the facts in this case are not in dispute, we apply a de novo standard of review. See State v.Otwell, 733 So.2d 950 (Ala.Crim.App. 1999).
 "With certain limited exceptions enumerated in subsection (b), and not here applicable, Ala. Code 1975, § 32-1-4 prohibits traditional custodial arrests for misdemeanor traffic offenses where the offender is willing to sign the UTTC. See Sheffield v. State, 522 So.2d 4, 7 (Ala.Cr.App. 1987); Hays v. City of Jacksonville, 518 So.2d 892, 893
(Ala.Cr.App. 1987). However, § 32-1-4(a) does permit `limited detention or custody' of traffic offenders and, consequently, an officer may `requir[e] a motorist to sit in a patrol car while the officer completes the [UTTC].' Pittman v. State, 541 So.2d 583, 585 (Ala.Cr.App. 1989) (citing United States v. Parr, 843 F.2d 1228, 1229-31 (9th Cir. 1988). The limited detention permitted by § 32-1-4(a) does not give rise to a search incident to arrest of either the motorist's person, State v. Davis, 477 So.2d 504, 506 n. 1 (Ala.Cr.App. 1985); Thomas v. State, 453 So.2d 1075, 1077 (Ala.Cr.App. 1984), or the motorist's vehicle, see Morton v. State, 452 So.2d 1361, 1364 (Ala.Cr.App. 1984), overruled on other grounds, Cannon v. State, 601 So.2d 1112
(Ala.Cr.App. 1992). While the officer may conduct a limited protective search for weapons of the motorist's person, Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and car, Michigan v. Long, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), he `must have an actual suspicion that weapons are present' in order to do so, United States v. Lott, 870 F.2d 778, 784 (1st Cir. 1989) (emphasis added). See generally 3 W. LaFave, Search and Seizure, §§ 9.4(a), (e) (2d ed. 1987).
 "Once the traffic offender signs the UTTC, the arresting officer is to `forthwith release him from custody.' § 32-1-4(a). The officer may further detain the driver only if he has probable cause to arrest the driver for some other non-traffic offense, see Hawkins v. State, 585 So.2d 154 (Ala. 1991), or has a reasonable suspicion of the driver's involvement in some other criminal activity justifying further detention for investigatory purposes under Terry v. Ohio, see United States v. Tapia, 912 F.2d 1367
(11th Cir. 1990).
 "`Reasonable suspicion is a less demanding standard than probable cause.' Alabama v. White, 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301
(1990). However, reasonable suspicion exists only if the officer has `specific, particularized, and articulable reasons indicating that the person [stopped] may be involved in criminal activity,' Hickman v. State, 548 So.2d 1077, 1080 (Ala.Cr.App. 1989). `To determine whether reasonable suspicion existed for a particular stop, the totality of the circumstances, as known to the officer at the inception of the stop, [or, in this case, at the time of the continued detention,] must be considered.' Arnold v. State, 601 So.2d 145, 149
(Ala.Cr.App. 1992) (emphasis added). Accord Lamar v. State, 578 So.2d 1382, 1385 (Ala.Cr.App.), *Page 452 
cert. denied, 596 So.2d 659 (1991)."
State v. Washington, 623 So.2d 392, 395-96 (Ala.Crim.App. 1993).
"It is well established that
 "`a police officer may make a brief investigatory detention based upon a "reasonable suspicion" of criminal activity. This court in State v. Bodereck, 549 So.2d 542, 545-46 (Ala.Cr.App. 1989), quoting from United States v. Post, 607 F.2d 847, 850 (9th Cir. 1979), discussed "reasonable suspicion" as mentioned in Terry [v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968),] and stated:
 "`"`[T]he quantum of cause necessary to justify an investigatory stop is a "reasonable" or "founded" suspicion that the person has committed or is about to commit a criminal act. . . . The founded suspicion must arise from specific facts and not inchoate hunches, but the officer is entitled to draw inferences from those facts in light of his experience.'"'
"Gaskin v. State, 565 So.2d 675, 677 (Ala.Cr.App. 1990) (emphasis added). When evaluating whether reasonable suspicion for a stop exists, we require that the police officer be able to
 "`"point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. Terry v. Ohio. . . . The appropriate question to ask is `. . . [W]ould the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?'. Terry v. Ohio, . . . Daniels v. State, 290 Ala. 316, 276 So.2d 441
(1973)."
 "`Sterling v. State, 421 So.2d 1375, 1379
(Ala.Cr.App. 1982).'
"Gaskin, 565 So.2d at 677.
". . . .
 ". . . [T]he law does not require that the appellant be engaged in illegal activity before an officer may make an investigative stop.
 "`"`[T]he relevant inquiry in evaluating the presence of reasonable suspicion is "`not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of non-criminal acts.'"'" State v. Washington, 623 So.2d at 397 (quoting United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir. 1990)) (quoting United States v. Sokolow, 490 U.S. 1, 10, 109 S.Ct. 1581, 1587, 104 L.Ed.2d 1 (1989), and Illinois v. Gates, 462 U.S. 213, 243-44 n. 13, 103 S.Ct. 2317, 2334-35
n. 13, 76 L.Ed.2d 527 (1983)).'
 "Hopkins v. State, 661 So.2d 774, 782 (Ala.Cr.App. 1994). When reviewing the degree of suspicion that attaches to noncriminal behavior, courts should give great deference to the training and experience of police officers. This court has noted that `"[w]hile many factors which can contribute to a reasonable suspicion of criminal activity are subject to a variety of interpretations, it is the experience of an officer that allows him to bring the factors together into a meaningful whole demonstrating reasonable suspicion of criminal activity."' Id. at 779 (quoting 2 W. Ringel, Searches and Seizures, Arrests and Confessions § 13.4(a) (2d ed. 1994))."
Williams v. State, 716 So.2d 753, 755-56 (Ala.Crim.App. 1998).
In this case, the appellee had not signed the warning ticket at the time Peoples called for Brown to respond to the area. Also, the State presented evidence *Page 453 
that the appellee was extremely nervous while Peoples was talking to him, his voice was cracking, his carotid pulse was visible, and he would not make eye contact with Peoples; that the appellee did not become less nervous after Peoples told him he was going to give him a warning; that the appellee had had a gun in his vehicle; that, when Peoples asked for consent to search his vehicle, the appellee was nearly in tears and told Peoples," `[M]an, you don't understand'"; that the appellee did not tell Peoples what he was talking about; and that Peoples had safety concerns about returning the weapon to the appellee. (R. 25-26.) Further, Peoples testified that the entire stop lasted only twenty-eight or twenty-nine minutes and that that length of time was normal for the type of stop involved in this case. The videotape of the traffic stop shows that nineteen minutes elapsed between the time Peoples told the appellee he was going to write him a warning and the time Brown and the dog completed their walk around of the appellant's vehicle; that, when Peoples contacted Brown, he was still waiting for information about the appellee's gun; and that, during the time they were waiting for Brown to arrive, Peoples received the information about the appellee's gun and started getting basic information from the appellee and obtained the appellee's insurance card, which was expired. The videotape also shows that, when Peoples initially asked the appellee for permission to search his vehicle, the appellee did not answer his question and that, after Peoples again requested permission to search the vehicle and commented on his nervousness, the appellee said, in a highly agitated voice, that Peoples did not understand. Finally, although the trial court stated during the suppression hearing that it had reviewed the videotape and that the appellee did not appear to be that nervous, we note that the appellee was not visible during most of the videotape and that his voice was barely audible during much of the videotape. Based on our review of the testimony and the videotape, we conclude that Peoples did not detain the appellee for an unreasonable amount of time during the traffic stop. Also, Peoples had reasonable suspicion to believe that criminal activity was afoot when he called for the K-9 unit. Therefore, he properly detained the appellee during the time he was waiting for Brown and while Brown walked the drug dog around the vehicle. Consequently, the trial court erroneously granted the appellee's motion to suppress the evidence law enforcement officers seized from his vehicle and his person. Accordingly, we reverse the trial court's judgment and remand this case to that court for proceedings that are consistent with this opinion.
REVERSED AND REMANDED.
McMILLAN, P.J., and SHAW, J., concur; COBB, J., dissents, with opinion, which WISE, J., joins.