KELLUM, Judge.
The appellant, Kendarius Lamond Peak, was indicted by a Jefferson County grand jury for three counts of capital murder. Specifically, Peak was charged with the capital offense of murder committed during a first-degree burglary or an attempt thereof, see § 13A-5-40(a)(4), Ala.Code 1975; the capital offense of murder committed during a first-degree robbery or an attempt thereof, see § 13A-5-40(a)(2), Ala. Code 1975; and the capital offense of murder committed during a kidnapping or an attempt thereof, see § 13A-5-40(a)(l), Ala. Code 1975. Following a jury trial, Peak was convicted of the lesser-included offense of felony murder, see § 13A-6-2(a)(3), Ala.Code 1975. The circuit court sentenced Peak to 23 years’ imprisonment and ordered Peak to pay a total of $4,941.62 in restitution.
The evidence presented at trial established the following pertinent facts. In August 2008, Natrice Mitchell and Romana “Bull” Keahey were in a dating relationship. Before Mitchell began dating Keah- *909 ey, she had been in a long-term relationship "with Robert Muse. Mitchell and Muse met when Mitchell was a freshman in high school. The two eventually lived together and had two children together. After Mitchell and Muse ended their relationship, Mitchell began dating Keahey. Mitchell and Keahey would sometimes stay together at the house Mitchell had shared with Muse. The record indicates that Muse and Keahey were cousins and were both drug dealers.
Mitchell and Muse maintained contact with one another for the benefit of their children. After Mitchell and Muse broke up and Mitchell began dating Keahey, Muse and Keahey got into an altercation as Muse was returning the children to Mitchell after a visit. While Muse was at Mitchell’s house, he saw Keahey drive by, got angry, and asked Mitchell to call Keah-ey. Once Mitchell contacted Keahey, Muse took the telephone from Mitchell and began shouting profanity at Keahey. When asked whether Muse ever made any threats toward Keahey during this time, Mitchell testified that on two occasions Muse said that he wanted to rob Keahey.
Mitchell testified that on August 10, 2008, she arrived home at approximately 9:00 p.m. and found Keahey and his cousin inside the residence. Shortly thereafter, Keahey’s cousin left in Keahey’s truck, and Mitchell and Keahey went to bed. Sometime after going to sleep, Mitchell was awakened when she and Keahey were “flipped out of the bed.” (R. 578.) Mitchell saw two men dressed in black and wearing ski masks. Mitchell testified that one of the men, whose voice she identified as being Muses’s, said “Ya’ll sleep with the doors open.” (R. 578.) Mitchell recognized the men based on their “body structures” as being Muse and Peak. Mitchell stated that she also recognized Muse and Peak by their voices and when she saw their eyes through the holes in the ski masks. Mitchell testified that she had known Muse and Peak for six years. Mitchell stated that Muse and Peak each had a gun when they entered her bedroom.
After Muse and Peak “flipped” Mitchell and Keahey out of bed, Muse took Keahey out of the bedroom and into the hallway while Peak stayed in the bedroom with Mitchell. Peak kept his gun out while he was in the bedroom with Mitchell. Mitchell testified that she heard Muse ask Keah-ey where the money was and she then heard Keahey throw up. Keahey told Muse that there was no money in the house. Mitchell testified the Keahey then asked “Robert [Muse], why you doing this?” and Muse stated “I ain’t Robert. My name ain’t Robert.” (R. 669.) Muse then returned Keahey to the bedroom and took Mitchell to the living room. While in the living room, Muse asked Mitchell “how could [she] do him like this, I thought we was going to get back together.” (R. 586.) After Mitchell and Muse finished talking, Muse returned to the bedroom and asked Keahey if he and Mitchell were just friends, to which Keahey responded in the affirmative. Muse and Peak then took Keahey’s wallet, watch, and some marijuana. Afterwards, Muse and Peak took Keahey out of the bedroom, and Keahey asked for his wallet back. Mitchell testified that she was still in the bedroom when she heard the men “tussling” at the side door in the kitchen. Mitchell then heard a “click,” like Keahey had been “hit upside the head with a gun or something.” (R. 593.) Mitchell then heard Keahey “holler” and a few moments later heard gunshots and “heard a car pull off.” (R. 594.) After the car left, Mitchell ran outside around the house and called Keahey’s name. When Keahey did not answer, Mitchell grabbed her car keys and left. Mitchell eventually went to her sister’s house where she telephoned the police and *910 gave a statement to investigators. Police subsequently found Keahey’s body two houses down from the house where Mitchell and Keahey had been staying.
After Keahey’s murder, Mitchell picked up her oldest son from Muse’s cousin’s house. When Mitchell arrived at the house, Muse and Peak were there. Mitchell testified that Peak came out to her car and apologized about what had happened at her house. Mitchell testified that Peak said “I’m sorry. I didn’t mean for that to happen. I didn’t know it was going to happen like that.” (R. 601.)
Mitchell testified that she and Muse argued frequently following the murder. Mitchell explained that Muse was not there for the kids anymore and that she believed that Muse was upset about what he had done. Mitchell testified that she got upset and “bust[ed] out” Muse’s car windows. (R. 602.) Mitchell also admitted to filing a false police report against Muse alleging that Muse had kidnapped someone.
Following the murder, Mitchell gave three statements to police — one statement immediately following the incident, a second statement in September 2008, and a third statement in December 2008. In her first two statements to police, Mitchell claimed that she did not know the identities of the two men who had robbed and murdered Keahey. During the second interview, Mitchell told police that Keahey told her that someone — not Muse or Peak — wanted to rob him. In her third interview with police, Mitchell told police that Peak and Muse robbed and murdered Keahey. Mitchell testified that she did not reveal the identities of Muse and Peak in her first two interviews with police because Muse was the father of her children. Mitchell testified that she decided to tell the police the truth because “it was the right thing to do.” (R. 605.)
John Glass, a neighbor of Mitchell’s, testified that he was awake with his young grandson in the early morning hours of August 11 when the robbery and murder occurred. Glass testified that he heard a “muzzle gunshot and screams.” Glass ran to the front porch of the house and saw a man “pass and stop and another man come down and hand each other something.” (R. 710.) Glass described the first man as young, medium-colored, 5 feet, 125 pounds with short hair. He described the second man as lighter-skinned, 5 feet 8 or 9 inches with braided hair. Glass believed that the first man was in his “teens” and that the second man was in his “twenties.” (R. 715.) Glass testified that he could not hear what the two men were saying but saw the taller man hand the smaller man some items. Glass then heard two more rounds of gunshots go off in the driveway. After seeing a gun flash, Glass saw two men standing in the driveway and one lying on the ground. After the two men ran away, the taller man walked back toward the driveway and shot at the body on the ground. Glass then moved from his front porch to look out the side windows where he saw three people standing and a man in the driveway. Glass described the third man he saw as heavier, dark-skinned, and also in his 20s. Glass testified that everyone left in two vehicles.
Peak and Muse’s first cousin, Valencia Harvell, helped Muse clean his house around the time of the murder. Valencia testified that while cleaning Muse’s house she found a box of “practically new” ski masks on Muse’s washer and dryer. (R. 530.) In the months before the murder, Valencia had overheard Muse say that he intended to rob Keahey. Valencia testified that Rodriques Thomas, who was also her cousin, had been spending time with Muse, Mitchell, and Keahey. Valencia described Thomas as being 19 years old at the time *911 of the murder, skinny with dark, short hair, and of “medium” height. (R. 531.)
Another cousin of Peak and Muse’s, Christopher Harvell, testified that Muse had said that he wanted to rob Keahey. Christopher testified that Muse had several guns that included a 9mm handgun and a 10mm handgun. Christopher testified that Peak carried a 9mm handgun that belonged to Muse.
Randy Underwood, a member of the crime-scene unit of the Birmingham Police Department, arrived at the crime scene at approximately 5:45 a.m. on August 11 to photograph the scene and to collect physical evidence. Underwood collected a 10mm shell casing in the front yard of the house where Keahey had been staying with Mitchell. Underwood collected two other 10mm shell casings near where Keahey’s body was lying. Underwood estimated that Keahey’s body was 120 feet from the house. Underwood collected a 9mm shell casing and another 10mm shell casing in the pathway near the side door of Keahey’s house in addition to another 9mm shell casing beside the stairs to the house. Underwood also collected a baseball hat found in the alley behind Keahey’s house. Underwood testified that the hat had a letter “P” on the front and that genetic testing on the hat revealed that it had been worn by a male.
Dr. Gary Simmons, a forensic pathologist who performed an autopsy on Keah-ey’s body in August 2008, testified that Keahey sustained a gunshot wound to the back of the head, gunshot wounds to both his right and left arms, and a gunshot wound to the back. Keahey also sustained a graze gunshot wound to the right forearm. Keahey died as a result of the gunshot wounds to his head and his back.
Peak, who was 23 years old at the time of trial, testified on his own behalf. Peak stated that he was approximately 6 feet tall and weighed close to 300 pounds. According to Peak, Muse was “semi” in the drug-selling business. Peak denied that he had ever owned a gun or that he had ever carried a gun on a regular basis. Peak further denied that the hat found in the alley behind Keahey’s house belonged to him and testified that he had never seen the hat before trial. Peak testified that he did not know Keahey, and he denied any involvement in his murder. On cross-examination, Peak admitted that he told police during questioning following the murder that he owned a baseball hat with a “P” on it. Peak explained that he threw the hat away while at Mitchell’s house on the Friday or Saturday before the murder.
In rebuttal, the State called as a witness Detective Roy Bristow, who testified that Muse and Peak were arrested in January 2009 for the robbery and murder of Keah-ey. Bristow testified that at the time of his arrest, Muse was wearing his hair braided tightly to his head and that Muse was approximately 5 feet, 8 inches tall and weighed approximately 140 to 150 pounds. After Peak was arrested and waived his Miranda[1] rights, Peak gave a statement to Bristow. The statement was video-recorded and played for the jury. In his statement to police, Peak told Detective Bristow that he had heard of Keahey before, that he knew Keahey was a drug dealer, and that he knew Keahey had money. Peak further stated that he used to have a gun but that after shooting himself with the gun he gave it away.
Peak’s case was tried before a jury. After both sides had rested and the court had instructed the jury on the applicable principles of the law, the jury found Peak *912 guilty of one count of felony murder. This appeal followed.
I.
Peak first contends that the circuit court erred in denying his motion for a mistrial when, after the jury deliberations had already begun, the circuit court substituted an alternate juror who had been released for another juror who had been threatened by either a family member or a friend of Peak’s. Peak argues that the circuit court’s actions violated Rule 18(g)(1), Ala. R.Crim. P., which, Peak says, requires that any alternate juror who does not replace a principal juror, “shall be discharged at the time the jury retires to consider its verdict.” Rule 18.4(g)(1), Ala. R.Crim. P.[2]
Before addressing the merits of Peak’s contention, it is necessary to set forth in detail the unique circumstances surrounding the jury during the trial and, more specifically, during deliberations. After the jury — consisting of 12 principal jurors and 2 alternates — was empaneled and several witnesses had testified, the circuit court received notice on Tuesday, October 19, 2010, that Juror J.G.’s uncle had died while Juror J.G. was serving on the jury. Juror J.G. informed the circuit court that she would be able to continue to serve on the jury. The circuit court spoke with Juror J.G. again the following day and learned that the funeral had been scheduled for 11:00 a.m. on Friday, October 22. Juror J.G. told the circuit court that she would have no problem continuing to serve as a juror so long as she could attend the funeral. Without objection, the circuit court decided that it would leave Juror J.G. on the jury and wait to see how the trial progressed. The circuit court noted at that time that it might become necessary to use Juror J.G. as an alternate instead of a principal juror. After the defense rested, the circuit court again considered Juror J.G.’s service as a juror. The circuit court and the parties decided to have Juror J.G. return the following morning on October 21, 2010, to ensure that all jurors and alternates were present before the court excused Juror J.G. from further service.
When court resumed the morning of October 21, 2010, the circuit court was presented with another juror issue. This time, Juror S.W. informed the bailiff that she had encountered Peak’s girlfriend the night before at a Wal-Mart discount store. Juror S.W. told the circuit court that she asked a Wal-Mart employee where the apple fritters were and that the employee identified herself as Peak’s girlfriend and questioned Juror S.W. about her service on Peak’s jury. Once Juror S.W. learned that the employee was Peak’s girlfriend, Juror S.W. walked away. After a discussion with the parties, the circuit court ordered Peak’s girlfriend to leave the courtroom until the jurors began their deliberations.
Shortly after the State’s rebuttal case and the charge conference, the prosecutor informed the circuit court that Keahey’s sister, Antoinette O’Neal, had overheard Peak’s girlfriend in the hallway threaten *913 Juror S.W. in retaliation for Juror S.W.’s telling the circuit court about the incident at Wal-Mart. Specifically, O’Neal testified that Peak’s girlfriend said that she was going to “beat [Juror S.W.’s] ass” and that she thought that Juror S.W. lived in Inglenook. Peak’s girlfriend denied making any threats toward Juror S.W. With concerns for the safety of Juror S.W. and in light of the death of Juror J.G.’s uncle, the circuit court named Juror S.W. and Juror J.G. as alternates, replacing them with the existing alternates, Jurors K.L. and A.D. Juror S.W. was then immediately excused from her service on the jury.
After its oral charge to the jury, the circuit court announced that Juror J.G. was the one remaining alternate. The circuit court then excused the 12 jurors to deliberate. Before excusing Juror J.G., the circuit court instructed Juror J.G. as follows: “I would ask you not to discuss the case with anybody until tomorrow mid-morning. All right. If we get past tomorrow midmorning, then you can discuss [the case] with whomever you’d like after that time.” (R. 1017.) Juror J.G. told the circuit court “okay.” (R. 1017.) At the circuit court’s request, Juror J.G. gave the court her telephone number in the event any issues arose concerning the remaining jurors and the possibility that she may need to be called back into court for jury service. Shortly thereafter, the jury concluded deliberations for the day and was excused for the evening.
The following morning on October 22, 2010, Juror A.D. informed the court when she arrived that she was upset over some problems she had had the day and night before. Deliberations were postponed while the circuit court investigated Juror A.D.’s concerns. Juror A.D. explained to the circuit court that there had been three incidents that upset her. The first occurred outside the courthouse the day before when Juror A.D. was leaving the courthouse for lunch and she overheard members of Peak’s family say that Juror A.D. “knew Natrice, you know, what they going to do about her.” (Vol. VIII, R. 7.) The second incident occurred during the circuit court’s oral charge when Juror A.D. saw someone in the hallway through the courtroom window, who was looking at her and making a gesture with his hand like he was pointing a gun to his temple. The third incident occurred when Juror A.D. was leaving the courthouse after the jury had been excused for the evening. Juror A.D. told the circuit court that someone gave her a threatening look that made her feel so uncomfortable that she had difficulty driving home. Juror A.D. assured the circuit court that no other members of the jury knew about the incidents — a fact later confirmed by the circuit court when questioning the remaining members of the jury. When asked if she could deliberate and not let the incidents affect her in any way, Juror A.D. stated that she could, but that what had happened would “always be on [her] mind.” (Vol. VIII, R. 12.) With both parties in agreement, the circuit court excused Juror A.D. from further service on the jury.
The circuit court instructed the bailiff to contact Juror J.G., who agreed to return to court following her uncle’s funeral. Once Juror J.G. returned, the circuit court asked Juror J.G. if she followed the court’s instructions not to talk to anyone about the case. Juror J.G. assured the court that she had followed the court’s instructions and had not discussed the case, other than to tell her husband that it was a serious case, and that it did not bother her to not have to sit on the jury. The circuit court then brought the remaining members of the jury into open court and informed them that Juror J.G. had returned to serve on the jury. Specifically, the court instructed the jury as follows:
*914 “All right. Ladies and gentlemen, I have discussed with [Juror J.G.] the fact that we had to excuse one of the jurors and that she had been requested to come back and to replace that juror. What I’m going to do — and she was here during all of the testimony and during all of the instructions and charges that I gave you as jurors. So what I’m going to do is I’m going to send all of you back as a new group of twelve and I’m going to ask you to or instruct you to disregard your previous deliberations and start anew. I want the twelve of you now, this is the new jury, to disregard your previous deliberations, go back there and discuss with this group of twelve and reach — attempt to reach a verdict in the case. All right?
“All right. You’ve got everything that you need to begin your deliberations so I’m going to go ahead and send you back there and ask you to start.”
(Vol. XIII, R. 32.)
At the outset, we question whether this issue has been properly preserved for review on appeal. The record indicates that defense counsel first moved for a mistrial after Juror A.D. was excused from further service on the jury and the circuit court called Juror J.G. back to serve on the jury. Specifically, defense counsel stated: “We’re going to move for a mistrial. We feel as though that to bring a juror back after deliberations began and have them restart deliberations is wrong.” (Vol. XIII, R. 30.) Following his initial request for a mistrial, defense counsel again asked the circuit court for a mistrial but never gave additional reasons relating to the substitution of the alternate juror. At the conclusion of the trial proceedings, counsel filed a motion for a new trial in which he argued for the first time, among other things, that the circuit court had erred in failing to grant his motion for a mistrial because the substitution of the alternate after deliberations began violated the express language of Rule 18.4(g)(1), Ala. R.Crim. P.
“The statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial.” Ex parte Frith, 526 So.2d 880, 882 (Ala.1987). “A defendant is bound by the grounds of objection stated at trial and may not expand those grounds on appeal.” Griffin v. State, 591 So.2d 547, 550 (Ala.Crim.App.1991). “The purpose of requiring a specific objection to preserve an issue for appellate review is to put the trial judge on notice of the alleged error, giving an opportunity to correct it before the case is submitted to the jury.” Ex parte Works, 640 So.2d 1056, 1058 (Ala.1994).
Moreover, as our Supreme Court stated in Lloyd Noland Hospital v. Durham, 906 So.2d 157 (Ala.2005):
“[A] ground offered in support of an objection to a procedural defect in the trial, asserted for the first time in a motion for a new trial, presents nothing for review. Ex parte Eaton, 675 So.2d 1300 (Ala.1996). ‘[A] party cannot allow a trial to be conducted, and then, on a motion for a new trial, raise arguments that should have been presented during trial.’ 675 So.2d at 1301. Rush v. Eason Plumbing & Elec. Contractors, Inc., 361 So.2d 516, 518 (Ala.1978) (‘A motion for a new trial cannot replace a timely objection or exception which could, and should, properly be made during the trial.’).”
906 So.2d at 164-65. Thus, Peak cannot now rely on Rule 18.4(g)(1), Ala. R.Crim. P., in support of his argument that the circuit court should have granted a mistrial based on the substitution of a juror after the jury had begun deliberations.
*915 Regardless of Peak’s failure to preserve his argument that the substitution violated Rule 18.4(g)(1), Ala. R.Crim. P., Peak’s general challenge to the propriety of the circuit court’s denial of a motion for a mistrial based on the substitution of a juror during deliberations is properly before us for review on appeal.
“A mistrial is a drastic remedy that should be used sparingly and only to prevent manifest injustice.” Hammonds v. State, 777 So.2d 750, 767 (Ala.Crim.App. 1999) (citing Ex parte Thomas, 625 So.2d 1156 (Ala.1993)), aff'd, 777 So.2d 777 (Ala.2000). A mistrial is the appropriate remedy when a fundamental error in a trial vitiates its result. Levett v. State, 593 So.2d 130, 135 (Ala.Crim.App.1991). “The decision whether to grant a mistrial rests within the sound discretion of the trial court and the court’s ruling on a motion for a mistrial will not be overturned absent a manifest abuse of that discretion.” Peoples v. State, 951 So.2d 755, 762 (Ala.Crim.App.2006).
Our Supreme Court recently addressed the issue whether a mid-deliberations substitution of an alternate juror was permissible in Lloyd Noland Hospital v. Durham, supra. In Lloyd Noland — a civil, medical-malpractice case — the circuit court charged the jury and designated one of the jurors as an alternate. The court instructed the alternate juror to go to one of the conference rooms in the courthouse while the jury deliberated. On the second full day of deliberations, 1 of the 12 principal jurors failed to appear for jury duty. The defendant objected to substituting the alternate late in the deliberative process and moved for a mistrial. Lloyd Noland, 906 So.2d at 162. The circuit court denied the motion for a mistrial, brought the alternate before the court, and inquired whether the alternate had spoken to anyone about the case. After learning that no discussion had taken place, the circuit court confirmed that the alternate “could be an impartial juror; that she could weigh the evidence and testimony and be fair to both sides; and that she could render a true and impartial verdict.” 906 So.2d at 162. The circuit court then assembled the reconstituted jury and instructed it to begin its deliberations anew. After deliberating for two hours, the jury returned a verdict in favor of Durham. The hospital subsequently filed a motion for a new trial, arguing for the first time that replacing the absent juror with the alternate after deliberations had begun violated Rule 47(b), Ala. R. Civ. P. The circuit court denied the motion, and the hospital appealed.
Finding that the hospital’s Rule 47(b) argument was not properly preserved for review on appeal, the Supreme Court considered only whether the circuit court erred in refusing to declare a mistrial in the face of the hospital’s assertion that placing the alternate on the jury would disadvantage and unduly prejudice the hospital in light of the “dynamic of the deliberation process.” Lloyd Noland, 906 So.2d at 167-68. In considering the issue presented, our Supreme Court stated:
<fWe agree with the Hospital that the appellate courts of this State have never addressed the issue whether such a mid-deliberations substitution of an alternate juror is permissible. In Cork v. State, 433 So.2d 959 (Ala.Crim.App.1983), a regular juror was discharged immediately before the case was submitted to the jury for deliberations, and an alternate substituted. The appellant in that case had objected to the substitution on the basis that there was no necessity for excusing the original juror. The Court of Criminal Appeals concluded that the trial judge had acted within its sound discretion in excusing the juror. In *916 Toombs v. State, 789 So.2d 550 (Ala.Crim.App.1999), a mid-deliberations substitution was made and, although the defendant moved for a mistrial on the ground that the substitution infringed on his right to a fair trial, he did not argue that ground on appeal. Rather, he argued on appeal only that the trial judge had committed reversible error by having an ex parte communication with the jury after it had begun its deliberations. Thus, the Court of Criminal Appeals held that the issue argued on appeal had not been preserved but volunteered that, even if it had, ‘the trial judge’s communication with the jury did not amount to reversible error.’ 789 So.2d at 552.
“Both parties have cited various cases from other jurisdictions on point, but most of those cases are inapposite because they rely on a particular rule of procedure of that jurisdiction and/or a particular state constitutional provision, whereas for the reasons explained, we cannot consider on this appeal the implications of Rule 47, Ala. R. Civ. P., or § 11 of the Alabama Constitution. A thorough survey of the cases from other jurisdictions is found in David B. Sweet, Annotation, Propriety, Under State Statute or Court Rule, of Substituting State Trial Juror with Alternate After Case has been Submitted to Jury, 88 A.L.R.4th 711 (1991). Both the Hospital and Durham discuss in their respective briefs a number of those cases, and it may be fairly said that with respect to the two main issues involved — whether a mid-deliberations substitution is error per se and whether such an error can be considered harmless — cases go both ways. All of the cases cited by the Hospital are criminal cases, including some death-penalty eases. In most of those cases, a state procedural rule or a state statute, or both, expressly mandated the discharge of alternate jurors once the regular jurors began their deliberations. For example, in People v. Burnette, 775 P.2d 583 (Colo.1989), and State v. Bobo, 814 S.W.2d 353 (Tenn.1991), both cited by the Hospital, the state’s applicable rule of criminal procedure mandated that ‘[a]n alternate juror who does not replace a regular juror shall be discharged when the jury retires to consider its verdict.’ Rule 18.4(g)(1), Ala. R.Crim. P., contains substantially identical language. It may be contrasted with the less specific language of Rule 47(b), Ala. R. Civ. P., but this case does not require us to consider whether that difference in phrasing between the two rules is meaningful. Suffice it to say that in Burnette and Bobo the mandatory language controlled. Also implicated in both of those decisions were the respective state constitutional provisions relating to trial by jury.
“In certain of the cases in which the court was unwilling to entertain a harmless-error analysis of a mid-deliberations substitution, it was important that the alternate juror had been discharged or otherwise allowed to resume his or her normal activities in the community before being recalled and that the alternate was not questioned about those activities or a present ability to serve on the jury when recalled. E.g., Burnette. Once we eliminate from the cases cited by the Hospital those relying, in whole or part, on violations of state criminal statutes; violations of state criminal procedural rules; violations of state constitutional provisions relating to the right to trial by jury; and/or the inadequacy of the questioning of the alternate juror and the instructions given the alternate and the remaining regular jurors, we find no case ordering a reversal of a judgment for a mid-deliberations substitution of an alternate juror solely be *917 cause the substitution created an abstract disadvantage or prejudice to the objecting party or because of ‘the dynamic of the deliberation process.’ As the court noted in State v. Sanchez, 129 N.M. 284, 6 P.3d 486, 490-92 (2000), Federal Rule of Criminal Procedure 24(c) originally required that any substitution of an alternate juror occur before the alternate jurors were discharged and before the jury retired to deliberate. Effective December 1, 1999, however, Rule 24(c), Fed.R.Crim.P., was amended to read as follows:
“ “When the jury retires to consider the verdict, the court in its discretion may retain the alternate jurors during deliberations. If the court decides to retain the alternate jurors, it shall insure that they do not discuss the case with any other person unless and until they replace a regular juror during deliberations. If an alternate replaces a juror after deliberations have begun, the court shall instruct the jury to began its deliberations anew.’
“ ‘State courts are increasingly willing to allow substitution during deliberation of an alternate juror kept separate from the deliberating jurors.’ Jon D. Ehlinger, Substitution of Alternate Jurors During Deliberations: Constitutional and Procedural Considerations, 57 No-tre Dame Law. 137, 161 (1981). Should a judge decide, in his or her discretion, to allow an alternate juror to substitute for a regular juror during deliberations, the court should ‘conduct a careful voir dire of the alternate to determine if he has been subject to any impermissible outside influence and can still make a fair decision.’ Additionally, ‘[t]he court should further instruct the regular jurors to begin deliberations anew, or to summarize to the alternate juror the extent of the deliberations to that point.’ Id. at 164.
“Given the limited grounds for a mistrial presented to the trial judge and the corresponding narrow scope of our review and the steps the trial judge took to attempt to counteract the potential for the particular prejudice about which the Hospital expressed concern, including an admonitionary final charge to the jury, to which no objection was made, we cannot say that the trial judge committed reversible error in denying the Hospital’s motion for a mistrial on the juror-substitution issue.”
Lloyd Noland, 906 So.2d at 166-68.
In this case, as in Lloyd Noland, the issue before us is limited by the argument that was properly preserved for review on appeal. Therefore, we must decide if the circuit court’s decision to replace a juror with an alternate after deliberations had begun necessitated a mistrial under the particular facts and circumstances of this case. The record on appeal established that the circuit court instructed Juror J.G., as the last remaining alternate, not to discuss the case with anyone until midmorning the next day. The jury deliberated for approximately one and one-half hours before going home for the evening. The following day, the circuit court postponed deliberations until it could telephone Juror J.G. to return to court. When questioned if she had followed the circuit court’s instructions not to talk to anyone about the case, Juror J.G. indicated that she had complied with the court’s instructions. The circuit court then brought the remaining jurors into the courtroom and instructed the jury to begin its deliberations anew. Given the argument presented on appeal and the steps taken by the circuit court to coun *918 teract the potential for prejudice, including the circuit court’s questioning of Juror J.G. following her return to court and the instructions given to the jury to begin deliberations anew, we cannot say that the circuit court abused its discretion when it denied Peak’s motion for a mistrial on the issue of juror substitution. See Lloyd Noland, supra.
Moreover, even if the circuit court’s substitution of a juror once deliberations had begun was, in fact, error, Peak has failed to show that the circuit court’s substitution of a juror injured one of Peak’s substantial rights. Indeed, Peak — who was indicted for capital murder — was ultimately convicted of a lesser-included offense of felony murder. Because Peak was not unduly prejudiced by the substitution, any error by the circuit court was harmless. See Rule 45, Ala. R.App. P. (“No judgment may be reversed ... in any ... criminal case on the ground ... [of] error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken ... it should appear that the error complained of has probably injuriously affected the substantial rights of the parties.”).
II.
Peak also contends that the circuit court abused its discretion by admitting into evidence hearsay statements by Natrice Mitchell and Christopher Harvell, who both testified that they heard Muse say that he intended to rob Keahey because, Peak argues, the statements were inadmissible hearsay that did not fall under a recognized exception to the rule against hearsay.[3] Specifically, Peak contends that the statements were erroneously admitted under the Rule 803(3), Ala. R. Evid., hearsay exception because, he says, it was not shown that the statements were made by Muse “at the time of the [robbery and murder].” (Peak’s brief, p. 32.) Peak contends that the State failed to show that the statements were made by Muse in close proximity to the time of the actual robbery and murder.
“The admission or exclusion of evidence is a matter within the sound discretion of the trial court.” Taylor v. State, 808 So.2d 1148, 1191 (Ala.Crim.App.2000). “The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion.” Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000).
Hearsay is defined as “a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” Rule 801(c), Ala. R. Evid. A statement that constitutes hearsay may nonetheless be admissible under one of the exceptions to the hearsay rule. One such exception is the “state-of-mind” exception, as set out in Rule 803(3), Ala. R. Evid. Rule 803(3) provides that “[a] statement of the declarant’s then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)” is admissible as relevant evidence.
Our review of the record indicates that Peak raises his specific argument— namely, that Rule 803(3) does not apply because the State failed to show that Muse’s statement was made at the time of the robbery and murder — for the first time *919 on appeal. At trial, the State initially argued that Muses’s statement was admissible as a statement made by a co-conspirator. Defense counsel objected on the basis that the State had failed to present evidence of a conspiracy between Muse and Peak. After the circuit court indicated that it was inclined to agree with defense counsel regarding the lack of evidence of a conspiracy, the State argued that Muse’s statement that he wanted to rob Keahey was admissible under Rule 803(B), Ala. R. Evid., as a statement reflecting the declar-ant’s state of mind. The circuit court agreed with the State and held that Muse’s statement was admissible under Rule 803(3). The State then called Mitchell, Valencia Harvell, and Christopher Harvell to testify. The record indicates that when Mitchell was asked whether Muse made any statements about robbing Keahey, defense counsel objected generally on “hearsay” grounds. (R. 570.) In contrast, when Valencia Harvell and Christopher Harvell were asked a similar question regarding whether they had heard Muse say that he wanted to rob Keahey, defense counsel did not object.
“Review on appeal is limited to review of questions properly and timely raised at trial.” Newsome v. State, 570 So.2d 703, 716 (Ala.Crim.App.1989). Although Peak objected to the admission of Muse’s statement that he intended to rob Keahey, the objection lodged by Muse challenged the admission of the testimony on the basis that the State had failed to present evidence of a conspiracy between Muse and Peak. “A defendant is bound by the grounds of objection stated at trial and may not expand those grounds on appeal.” Griffin v. State, 591 So.2d 547, 550 (Ala.Crim.App.1991). “The statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial.” Ex parte Frith, 526 So.2d 880, 882 (Ala.1987). Therefore, this issue was not properly preserved for appellate review.
Furthermore, even if the circuit court erred in allowing Mitchell to testify — over defense counsel’s objection — regarding Muse’s statement that he intended to rob Keahey, the admission of the statement at trial did not necessarily constitute reversible error. In Snyder v. State, 893 So.2d 488 (Ala.Crim.App.2003), cert. de nied, 893 So.2d 563 (Ala.2004), cert. denied, 544 U.S. 1062, 125 S.Ct. 2512, 161 L.Ed.2d 1113 (2005), this Court explained:
‘“Testimony that may be apparently inadmissible may be rendered innocuous by subsequent or prior lawful testimony to the same effect or from which the same facts can be inferred.’ Yeomans v. State, 641 So.2d 1269, 1272 (Ala.Crim.App.1993). ‘The erroneous admission of evidence that is merely cumulative is harmless error.’ Dawson v. State, 675 So.2d 897, 900 (Ala.Crim.App.1995), aff'd, 675 So.2d 905 (Ala.1996).”
893 So.2d at 545. The record indicates that the circuit court did not grant defense counsel a continuing objection to the admission of Muse’s statement at trial and that, although defense counsel generally objected on hearsay grounds to Mitchell’s testimony regarding Muse’s statement, counsel did not object when the same testimony was elicited from Valencia Harvell and Christopher Harvell. Therefore, any error that may have resulted from the admission of Mitchell’s testimony regarding Muse’s statement that he intended to rob Keahey was harmless. Snyder, supra.
III.
Finally, Peak contends that the State presented insufficient evidence to prove that he acted as Muse’s accomplice in the robbery and murder of Keahey. Specifically, Peak contends that the evidence of *920 fered by the State “regarding whether Peak had any knowledge that Muse intended to rob Keahey was totally lacking.” (Peak’s brief, p. 36.)
‘““In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.’” Ballenger v. State, 720 So.2d 1033, 1034 (Ala.Crim.App.1998), quoting Faircloth v. State, 471 So.2d 485, 488 (Ala.Crim. App.1984), aff'd, 471 So.2d 493 (Ala.1985). 1 “The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.” ’ Nunn v. State, 697 So.2d 497, 498 (Ala.Crim.App. 1997), quoting O’Neal v. State, 602 So.2d 462, 464 (Ala.Crim.App.1992). ‘ “When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court’s decision.” ’ Farrior v. State, 728 So.2d 691, 696 (Ala.Crim.App. 1998), quoting Ward v. State, 557 So.2d 848, 850 (Ala.Crim.App.1990). ‘The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury.’ Ex parte Bankston, 358 So.2d 1040, 1042 (Ala.1978).”
Gavin v. State, 891 So.2d 907, 974 (Ala.Crim.App.2003), cert. denied, 891 So.2d 998 (Ala.2004) (quoting Ward v. State, 610 So.2d 1190, 1191 (Ala.Crim.App.1992)).
Under current Alabama law, there is no distinction between principals and accessories. See, e.g., Faircloth v. State, 471 So.2d 485, 489 (Ala.Crim.App.1984), aff'd, 471 So.2d 493 (Ala.1985) (“Alabama Code § 13A-2-23 (1975) continues the long recognized abolition of the distinction between principals and accessories in Alabama.”). As we noted in Peraita v. State, 897 So.2d 1161, 1210 (Ala.Crim.App.2003):
“Alabama’s accomplice liability statute provides:
“ ‘A person is legálly accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense:
“ ‘(2) He aids or abets such other person in committing the offense.... ’ “ § 13A-2-23, Ala.Code 1975.
“‘The words “aid and abet” encompass all assistance by acts, words of encouragement, or support, or presence, actual or constructive, to render assistance should it become necessary. Wright [v. State, 494 So.2d 936 (Ala.Crim.App.1986) ]; Sanders v. State, 423 So.2d 348 (Ala.Cr.App.1982). Actual participation in the crime need not be proved by positive testimony to convict someone of aiding and abetting. “The jury is to determine whether the appellant’s participation exists and the extent of it from the conduct of the parties and all the testimony presented.” Walls v. State, 378 So.2d 1186, 1191 (Ala.Cr.App. 1979), cert. denied, Ex parte Walls, 378 So.2d 1193 (Ala.1980). Such facts as the defendant’s presence in connection with his companionship, and his conduct at, before and after the commission of the act, are potent circumstances from which participation may be inferred.’
“Henry v. State, 555 So.2d 768, 769 (Ala.Crim.App.1989).
*921 “ ‘Any word or act contributing to the commission of a felony, intended and calculated to incite or encourage its accomplishment, whether or not the one so contributing is present, brings the accused within the statute that makes any person concerned in the commission of a felony, directly or indirectly, a principal.... No particular acts are necessary to make one an aider and abettor; the common enterprise or adventure may have been entered into on the spur of the moment without prearrangement or participation.’
“Scott v. State, 374 So.2d 316, 318-19 (Ala.1979).”
With regard to intent, this Court has stated:
“Normally there is no direct evidence of intent. ‘ “ ‘Intent, we know, being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence.’” Ex parte C.G., 841 So.2d 292, 301 (Ala.2002), quoting Pumphrey v. State, 156 Ala. 103, 106, 47 So. 156, 157 (1908).’ ”
Brawn v. State, 11 So.3d 866, 914 (Ala.Crim.App.2007). “ ‘The question of intent is hardly ever capable of direct proof. Such questions are normally questions for the jury.’” 11 So.3d at 914 (quoting Payne v. State, 946 So.2d 930, 935 (2006)(other citations omitted)).
Contrary to Peak’s contention on appeal, there was ample evidence from which the jury could have concluded that Peak, at the very least, aided and abetted Muse in the robbery and murder of Keah-ey. Indeed, the evidence indicates that either Peak or Muse or both fired shots that resulted in Keahey’s death. The evidence, when viewed in a light most favorable to the State, established that two armed men entered Mitchell’s house while Mitchell and Keahey were sleeping. Mitchell identified the two men as Muse and Peak. Mitchell testified that she was able to identify Muse and Peak based on their respective body types, their voices, and their eyes, which she observed through the holes in the ski masks the men wore. Once inside the house, Muse and Peak stole items from Keahey, including his wallet. Mitchell testified that she then heard the men “tussling,” heard Keahey “holler,” and heard gunshots a few moments later. Keahey died from injuries sustained following multiple gunshot wounds. Mitchell testified that shortly after Keahey’s murder, Peak expressed remorse for the murder. Bullet casings later found at the crime scene indicated that two weapons — a 9mm handgun and a 10mm handgun — were used to commit the robbery and murder. Muse and Peak’s cousin, Christopher Harvell, testified that Muse owned a 9mm handgun and a 10mm handgun and that Peak carried a 9mm handgun that belonged to Muse.
Mitchell’s testimony established Peak’s participation in the robbery and murder of Keahey. This Court has repeatedly recognized that the testimony of an eyewitness alone is sufficient to support a conviction. Dunning v. State, 659 So.2d 995, 998 (Ala.Crim.App.1994) (testimony of victim alone sufficient to establish prima facie case of robbery); Brewer v. State, 497 So.2d 567, 569 (Ala.Crim.App.1986) (same). Furthermore, “ ‘[t]he question of the victim[’s] credibility is one for the jury and not for this Court.’” Rowell v. State, 647 So.2d 67, 69 (Ala.Crim.App.1994) (quoting Coats v. State, 615 So.2d 1260, 1260 (Ala.Crim.App.1992)). Peak’s actions and presence at the time of the robbery and subsequent shooting of Keahey evidenced his complicity in the criminal activity. Given the evi *922 dence presented at trial and the standard by which we review the evidence, there was sufficient evidence presented from which the jury could have concluded that Peak participated in the robbery and murder of Keahey.
Based on the foregoing, the judgment of the circuit court is affirmed.
AFFIRMED.
WINDOM, P. J., and WELCH, J., concur. JOINER, J., concurs specially, with opinion. BURKE, J., joins in special writing.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. In support of his contention that the circuit court abused its discretion in denying his motion for a mistrial, Peak also argues that the circuit court’s actions violated Rule 18.4(g)(3), Ala. R.Crim. P., because the last two people struck were not ultimately considered the alternate jurors in this case. Peak raises this argument as a basis for reversal for the first time on appeal. " 'Review on appeal is restricted to questions and issues properly and timely raised at trial.' " Ex parte Coulliette, 857 So.2d 793, 794 (Ala.2003) (quoting Newsome v. State, 570 So.2d 703, 717 (Ala.Crim.App.1989)). Because Peak did not present this argument to the circuit court and, in turn, that court did not consider this argument, we decline to address the merits of this particular argument on appeal.

. Peak does not specifically challenge Valencia Harvell's testimony that she overheard Muse say that he intended to rob Keahey.