WELCH, Judge.
Thomas Brian Smoak appeals from convictions for making a terrorist threat, see § 13A-10-15, AIa.Code 1975, and possession of a deadly weapon with intent to do bodily harm on the premises of a school, see § 13A-11-72, Ala.Code 1975. For each conviction he was sentenced to 10 years’ imprisonment, the sentences to run concurrently.'
' Facts
• At approximately 8:30 a.m. on the morning of May 25, 2010, Smoak’s son, Patrick, a student at Athens High School, misbehaved at school and was to be punished by a five-day suspension. At approximately 9:45 Patrick’s mother was telephoned and asked to come pick Patrick up from school.[1] At approximately 10:00 a.m., Peggy Sutton, secretary for Athens High School, received a telephone call from a woman who did not identify herself, who stated that an emergency existed and that she needed to speak immediately with someone in authority over the school. Specifically, Sutton gave the following testimony on direct examination by the State regarding her conversation with the caller.
“Q. [Prosecutor:]- What was the emergency the caller told you? .
“A. [Sutton:] She said that her husband was very mad and that he was on his way to the school with a gun.”
(R. 203.) Sutton immediately notified the principal, Christopher Bolen, who was nearby in a parent/teacher conference. Bolen testified that the caller identified hérself as Mrs. Smoak, Patrick’s mother. She informed Bolen that her husband, Smoak, was angry about their son’s suspension and that he was on his way to the school with a shotgun and that the school needed to be locked down. Bolen gave the following testimony on direct examination by the State regarding his conversation with Mrs. Smoak:
“Q. [Prosecutor:] What did this witness tell you?
*497 “A. [Bolen:] She told me that her husband was upset that Patrick had been disciplined.
“Q. What else?
“A. She told me that he was angry and that he was headed to the high school and she. was concerned that we were in harm’s way, and that I needed to lock the school down.
“Q. All right. Did she inform you that he was armed with some type of weapon?
“A. She said he had . a loaded shotgun.”
(R. 221-22.) Mrs. ¡Smoak described Smoak’s vehicle as a blue Nissan Quest van with body damage. Bolen telephoned the police, and two police vehicles arrived in front of the school within five minutes. Before the police arrived, Bolen enlisted the help of two assistant principals and one teacher and they “locked down” the school by emptying the hallways of stray students and locking all the entrances to the school. There was testimony that Bolen’s actions were considered to be a “lockdown” of the school. In less than five minutes from receiving Mrs. Smoak’s telephone call, police officers, Bolen, and an assistant principal were standing in front of the school when they saw Smoak driving his vehicle onto what testimony described to be the school campus. Smoak was traveling on the road that ran alongside the school. It appeared to all the observers that he began to turn on to the road that ran in front of the school where Bolen and the officers stood, but abandoned his turn and “veered off and [went] behind the school.” (R. 226.) An officer drove his automobile around the opposite side of the school to meet Smoak head on. Although out of sight, Smoak apparently made a “U” turn behind the building because he emerged on the same road on the same side of the school from which he disappeared, but traveling in the opposite direction, i.e., away from the school. Smoak was pursued by police vehicles. There was testimony that he traveled approximately “two/ tenths of a mile” after police officers activated their blue lights before he voluntarily pulled his vehicle over. (R, 394.) There was testimony from an officer that “[i]t took longer than usual for him to stop.” (R. 418.)' There was testimony that officers had their weapons drawn before Smoak got our of his vehicle. When Smoak got out of his automobile, he screamed at the officers: “Shoot me. Just shoot me.” (R. 396.) The stock of a loaded shotgun was leaning on the front driver’s seat with the barrel resting on the front passenger floorboard. Smoak had three shotgun shells in his pants pocket. Smoke was arrested. Bolen further testified that Mrs. Smoak arrived at the school shortly following Smoak’s arrest and that Bolen spoke with her and that he could identify her voice as that of the woman who had-telephoned the school.[2]
I.
Smoak argues on appeal, as he did at trial in a failed motion for a judgment of acquittal, that the State presented insufficient evidence to support a conviction for making a terrorist threat.[3]
*498 “ ‘The trial court’s denial of a motion for judgment of acquittal must be reviewed,, by determining - whether there was legal evidence before the jury at the time the motion was made from which the jury by fair inference could find the defendant guilty. Thomas v. State, 363 So.2d 1020 (Ala.Crim.App.1978). In applying this standard, this court will determine only if legal evidence was,presented from which the jury could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199 (Ala.Crim.App.1983). ¡When the evidence raises questions of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial, of a motion for judgment of acquittal . does not- constitute eiyor. McConnell v. State, 429 So.2d 662 (Ala. Crim.App.1983).’ ”
Gavin v. State, 891 So,2d 907, 974 (Ala. Crim.App.2003) (quoting Ward v. State, 610 So.2d 1190, 1191 (Ala.Crim.App.1992) (citations omitted)).
The pertinent part of § 13A-10-15(a)(l), Ala.Code 1975, defines a terrorist threat as follows:
“(a) A person commits the crime of making a terrorist threat when he or she threatens by any means to commit any crime of violence or to damage any property by doing any of the following:
“(1) Intentionally or recklessly:
“a. Terrorizing another person.
“b. Causing the disruption of school activities.”
Therefore, “a person cannot threaten to commit a violent crime or to damage property in order to ‘intentionally or recklessly’ 1) terrorize another person, 2) disrupt school activities.” Survey of 2000 Alabama Legislation, 52 Ala. L.Rev. 1097, 1118 (2001).
Smoak specifically contends that there was no evidence that he communicated a threat by any means to anyone at Athens High School or to anyone at any time. He asserts that
“the State has relied on the statement of a female caller over the telephone who, stated her thoughts about [Smoak]. There was simply no evidence produced showing that [Smoak] made a terrorist threat. Further, there was no evidence presented that showed that [Smoak] had any knowledge that this call had been made to the school.”
(Smoak’s brief, at p. 28.) Smoak cites Lansdell v. State, 25 So.3d 1169 (Ala.Crim. App.2007), for the proposition that a threat “by any means” is defined as: “[A] threat may be made to another ‘in person, by written communication, over the telephone, or by some other means of electronic communication, such as e-mail or text-messaging’ to be found in violation of 13(A)-10-15. Lansdell at 1176.” (Smoak’s brief, at p, 27.) He argues:
“By these examples and this definition set forth by this Honorable Court, the [defendant, in order to make a terrorist threat, must, make some type of communication to an intended victim. Without this communication, or threat, a person cannot be found guilty of making a terrorist threat.”
(Smoak’s brief, at p. 27.)
The State does not dispute on appeal that Smoak “did not personally speak or threaten school officials” but argues that it *499 was Smoak’s action of going to the school with a loaded shotgun that established a terrorist threat. (State’s brief, at p. 16.)
“Smoak makes much of the fact that he did not personally speak or threaten school officials. Actions, however, speak louder than words, and Smoak’s actions personified a terrorist threat, a threat that any reasonable person would interpret as such.”
(State’s brief, at p. 16.)
The State further contends that there was sufficient circumstantial evidence from which the jurors could conclude that “Smoak’s actions in coming onto school property with a loaded shotgun posed a serious' threat.” (R. 19.) The State argues:
“The principal of the high school, the school secretary, three teachers, the Superintendent of Education, and three police officers all testified at trial that Smoak’s actions in coming onto school property with a loaded shotgun posed a serious threat, placed them on high alert, disrupted the school, and prevented parents and children from leaving the building.”
(State’s brief at p. 19.)
Posing a threat and making a terrorist threat are not synonymous. It is beyond dispute that Smoak posed a serious threat to the occupants of the school by coming on to school property with a loaded shotgun. However, the question for review is whether he committed a terrorist threat as defined in Alabama’s statute.
Alabama’s statute provides that a terrorist threat may be accomplished when a perpetrator “threatens by any means to commit any crime of violence or to damage any property,” § 13A-10-15(a), Ala.Code 1975. The State argues that it was Smoak’s having a loaded shotgun on school property was a threat “by any means” that recklessly caused the lockdown of the school. ' .
This Court in Lansdell, discussing whether the terrorist-threat statute was unconstitutionally vague, implied that a threat “by any means” was confined to a communication between a defendant and a victim: “‘[B]y any means’ signifies that there is no limitations on the means by which a person may threaten another — in person, by written communication, over the telephone, or by some other means of electronic communication, such as e-mail or text-messaging — and be found in violation of § 13A-10-15.” Lansdell, 25 So.3d at 1176,[4] However, generally, to be a terrorist threat the threat must have been “made for the ‘purpose’ of terrorizing another.” [5] Sonja Larsen, Threats and Unlawful Communications, 86 C.J.S. Threats § 24, (March 2015) (emphasis added). Therefore, the threat must be “communicated in such a way as to support the inference that the speaker intended or expected it to be conveyed to the victim.” John P. Ludington, Validity and Construction of Terrorist Threat Statute, 45 A.L.R.4th 949, Threats Communicated to Third Persons § 24 Cumulative Supple- *500 merit) (Originally published in 1986). Therefore, this Court now holds that a terrorist threat may be conveyed to a victim by a third person where the defendant “intended or expected it to be conveyed to the victim.” Id.
Alabama does not limit a terrorist threat to intentional conduct. A terrorist threat may be accomplished by reckless conduct. Recklessness is a culpable mental state defined in pertinent part as follows:
“A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates a risk but is unaware thereof solely by reason of voluntary intoxication, as defined in subdivision (e)(2) of Section 13A-3-2, acts recklessly with respect thereto.”
§ 13A-2-2(3), Ala.Code 1975. Thus, a person acts recklessly in making a terrorist threat when a defendant is aware of but disregards the risk that his or her communication will cause terror or disrupt school activities. That would, most likely occur where the threat of violence is so extreme that it would, if carried out, have such grave consequences that the defendant should have expected that it would be conveyed to the victim, causing terror or causing a disruption of school activities.
The evidence presented in this case was insufficient to support finding that Smoak made a threat. Mrs. Smoak did not testify at trial. It is undisputed that Mrs. Smoak telephoned the school and informed the principal that Smoak was angry and that he was headed to the school with,.a shotgun. However, the testimony before this Court regarding her comments presents only Mrs. Smoak’s perception of Smoak’s conduct. Mrs. Smoak did not say that Smoak verbalized a threat or that he said that he was going to the school with his loaded shotgun, or say that he said he intended to shoot anyone. Mrs. Smoak merely relayed her perception that Smoak had displayed an outburst of anger and her belief regarding his intentions. An outburst of anger is not, in and of itself, a threat and has no intentional or reckless consequences in the context of a terrorist threat.[6] It is clear that Mrs. Smoak prudently and properly acted on her perceptions and informed the school that Smoak was on his way to the school with a loaded shotgun and that Bolen and the police properly responded to Mrs. Smoak’s information. The possibility that Smoak would arrive with a loaded shotgun was reason to lock down the school. Moreover, the jury could find,' as it did, that Smoak’s having a shotgun was evidence of his intent to commit & violent act at a school. However, there was no evidence — as it was characterized at trial — indicating that Smoak intended to threaten anyone or that his conduct at his home indicated that hfe was aware but that he disregarded the risk that his conduct would cause fear resulting in the lockdown of the school.[7]
*501 Because the State failed to present sufficient evidence of a threat, Smoak’s conviction for making a terrorist threat must be reversed and a judgment of acquittal rendered.
II.
Smoak was convicted pursuant to Count II of the indictment with possessing a deadly weapon with the intent to do bodily harm on the premises of Athens High School. Smoak presents the following issues for appellate review regarding that conviction.
A.
Smoak contends, as he did at trial, that the State failed to prove an element of the offense charged in his indictment. Count II of the indictment returned against Smoak charged as follows:
“COUNT 2
“The Grand Jury of said county further charge that, before the finding of this indictment, THOMAS BRIAN SMOAK, whose name is otherwise unknown to the Grand Jury, did, on or about May 25, 2010, possess a deadly weapon with the intent to do bodily harm on the premises of a public school, to-wit: possess a shotgun ,on the grounds of Athens High School after stating that he was mad at school officials about the handling of a disciplinary situation with his son, in violation of Section 13A-ll-72(c) of the Code of Alabama ....”
(C. 60.) Smoak contends that the following element was not proven at trial: “[H]e was mad at school officials about the handling of disciplinary situation with his son.” (C. 60.)
“Subject to the exceptions provided by Section 13A-11-74,” which are not applicable in Smoak’s ease, § 13A-ll-72(c), Ala. Code 1975, prohibits the following:
“... [N]o person shall knowingly with intent to do bodily harm carry or possess a deadly weapon on the premises of a public school.”1
§ 13A-ll-72(c), Aa.Code 1975.
 The indictment tracked the language of the statute and properly apprised Smoak of the charge against him. See § 13A-11-72(c), Aa.Code 1975. “ ‘An indictment is sufficient if it apprises the accused with a reasonable certainty of the nature of the accusation against him so that he may prepare his defense and plead the judgment of conviction as a bar to any subsequent prosecution for the same offense.’ ” Moore v. State, 659 So.2d 205, 208 (Aa.Crim.App.1994) (quoting Rice v. State, 620 So.2d 140, 142 (Aa.Crim.App.1993)). “ ‘As long as the remaining portions of the indictment validly charge a crime, the existence of surplusage in the indictment will not effect the validity of the conviction.’ ” State v. Alexander, 25 So.3d 490, 492 (Ala. Crim.App.2009) (quoting Rogers v. State, 539 So.2d 451, 453 (Aa.Crim.App.1988)).
“ ‘The rule .in our.State is that an allegation- in an indictment which is but mere surplusage may be disregarded — it is immaterial for any purpose. The exception to this rule — which does not occur in this case — is that if the allegation (constituting surplusage) “is descriptive of the fact dr degree of the crime, or is material to the jurisdiction” it must be proved as alleged. See McGehee v. State, 52 Aa. 224 [ (1875)].’ Brown v. State, 30 Ala.App. 339, 7 So.2d 24 (1941) (emphasis in original).”
*502 McCall v. State, 501 So.2d 496, 507 (Ala. Crim.App.1986). The surplusage, which supplied Smoak’s motive for committing the crime, did not affect the degree of the crime, nor did it affect the jurisdiction of the court. Therefore, any reference to motive in,the indictment was surplusage. This argument is without merit.
B.
Smoak contends, as he did at trial in his failed motion for a judgment of acquittal, that the State failed to prove the element of intent to do bodily harm. Testimony was admitted into evidence that employees at the high school received a telephone call telling them that Smoak was upset that his son, Patrick, had been disciplined for misconduct at school and that Smoak was on his way to the high school and armed with a “loaded shotgun.” (R, 222.) Smoak arrived at the high school within minutes of receipt of that telephone call. It appeared to officers present at the high school that he was intentionally evading the officers at the school, and there was some testimony, if believed by the jury, that he did not immediately stop when police officers indicated that he should pull his vehicle over. Smoak’s demeanor after being pulled over was belligerent, and he told officers to “just' shoot [him.]” (R. 396.) There was a loaded shotgun on the front seat of Smoak’s vehicle and three shotgun shells in his pants pocket.
“ ‘ “[I]ntent, ... being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by. witnesses and the circumstances as developed by the evidence.” McCord, v. State, 501 So.2d 520, 528-529 (Ala.Cr.App.1986), quoting Pumphrey v. State, 156 Ala. 103, 47 So. 156 (1908).’
“French v. State, 687 So.2d 202, 204 (Ala.Crim.App.1995), aff'd in part, rev’d in part on other grounds, 687 So.2d 205 (Ala.1996).
“1 “The question of intent is hardly ever capable of direct proof. Such questions are normally questions for the jury. McMurphy v. State, 455 So.2d 924 (Ala.Crim.App.1984); Craig v. State, 410 So.2d 449 (Ala.Crim.App. 1981), cert. denied, 410 So,2d 449 (Ala. 1982).” Loper v. State, 469 So.2d 707, 710 (Ala.CrApp.1985).’
“Oryang v. State, 642 So.2d 989, 994 (Ala.Crim.App.1994).”
Connell v. State, 7 So.3d 1068, 1090-91 (Ala.Crim.App.2008).
Here, the State’s evidence was sufficient for the jury to infer that Smoak possessed a deadly weapon with the intent to do bodily harm on the premises of Athens High School.
C.[8]
Smoak contends, as he did at trial, that the testimony of Sutton and Bolen regarding statements made by a female over the telephone were inadmissible hearsay.
The “female” caller was positively identified by Bolen as Mrs. Smoak. Bolen testified that the caller identified herself as Mrs. Smoak, that Mrs. Smoak arrived at the school shortly after Smoak’s arrest, and that he spoke with her. He testified that, after speaking to her, he recognized *503 her voice as that of the person who had telephoned the information about Smoak.
Rule 901(b)(5), Ala. R. Evid., allows authentication of telephone calls as follows':
“Voice Identification. Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker.”
The trial court properly admitted Sutton’s and Bolen’s testimony regarding Mrs. Smoak’s telephone call over Smoak’s hearsay objection.
Hearsay “is a statement, other than one made by. the declarant while testifying at the' trial or hearing, offered in evidence to prove the truth of the matter asserted.” Rule 801(c), Alá. R. Evid. Rule 803(2), Ala. R. Evid., provides that “[a] statement relating to a startling event or condition made while the declarant was under stress of excitement caused by the event or condition” is admissible under the excited-utterance exception to the hearsay rule. In C. Gamble, McElroy’s Alabama Evidence § 265.01(1) (5th ed.1996), we find the following regarding the excited-utterance exception:
“Generally, a person’s statement concerning a startling occurrence made while perceiving the occurrence, or soon after perception thereof, and while the declarant is under the stress of a.nervous excitement created by such perception is admissible as tending to prove the truth, of the matter asserted. A statement of this kind is frequently referred to as a spontaneous exclamation or excited utterance and is an exception to the hearsay evidence rule.
[[Image here]]
“This rule sets out three conditions which must be met for admission of the -statement. There must be a startling event or' condition, the statement must relate to the circumstances of the occurrence, and the statement must be made before time has elapsed sufficient for the declarant to fabricate. The statement must be the apparently spontaneous product of that occurrence operating upon the visual, auditory, or other perceptive sense of the speaker. The declaration must be instinctive rather than deliberative. In short, it must be the ■ reflex product of the immediate sensual impressions, unaided by retrospective mental action. Whether a statement qualifies as an excited utterance is a preliminary and discretionary question for the trial court.
“Although a statement of this kind is nearly always referred to or. described in the Alabama decisions' as being part of the res gestae, it is submitted that the terms ‘spontaneous exclamation’ and ‘exr cited utterance’ are preferable because the words ‘res gestae’:have been used to signify so many-, different things that their use is calculated to promote confusion as to the proper scope of the present exception-.
(Footnotes omitted.) >
Based on the time frame between Mrs. Smoak’s telephone call and Smoak’s arrival at the- school, it can be inferred that Mrs. Smoak placed the telephone call while she was perceiving a startling occurrence— Smoak’s frightening behavior — and that it was made while Mrs. Srrtoak was “under the stress of a nervous excitement” caused by ’Smoak’s behavior. Therefore, Sutton’s and Bolen’s testimony was properly admitted into evidence because Mrs. Smoak’s statements fell under the excited-utterance exception to the hearsay rule. See, e.g., Berryhill v. State, 726 So.2d 297 (Ala.Crim.App.l998)(holding that witness’s testimony regarding a telephone conversa *504 tion she had had with the -victim on the day- of the victim’s death, which was made while the victim was under the stress of nervous excitement created by the perception that an intruder was in his- house, was admissible under the excited-utterance exception to the hearsay rule).
III.[9]
Smoak argues, as he did at trial in a failed motion to suppress, that the stop of his vehicle was illegal because, he argues, the officers did not have probable cause to stop his vehicle and to arrest him and seize evidence. ■
Police officers received a dispatch asserting that there was a problem at the high school and that “a subject'was bringing a gun to the high school.” (R 423-24.) When the officers arrived, Bolen told the officers that he had received a telephone call stating that a man driving a “beat-up” blue Nissan Quest Van with fender damage was on his way to the school with a weapon and that the man was mad because his son had been suspended from' school that morning. (R. 388, 424.) Officers arrived at the school and within a few-minutes saw the described van approach the school and drive onto school property. The van began a turn toward the officers; it then abandoned the turn and continued traveling to the rear of the school property and out of sight. Seconds later, the van reemerged on the same road traveling in the opposite direction and away from the school. Officers began pursuit of the van. There was testimony that Smoak did not immediately stop when officers initiated the blue lights on their vehicles.
Contrary to Smoak’s argument, the officers did hot need probable cause to stop his vehicle for an investigation of criminal activity. The initial question is whether there was reasonable suspicion to stop and investigate. Reasonable suspicion is a less stringent standard than probable cause, requiring “only that the officers have ‘specific, particularized, and articulable reasons indicting that the person may be inyolved in criminal activity.’ ” Scarbrough v. State, 621 So.2d 996, 1001 (Ala.Crim.App.1992) (quoting Lamar v. State, 578 So.2d 1382, 1385 (Ala.Crim.App. 1991)).
“It is well established that
‘“a police officer may make a brief investigatory detention based upon a “reasonable suspicion” of criminal activity. This court in State v. Bodereck, 549 So.2d 542, 545-46 (Ala.Cr, App.1989), quoting, from United States v. Post, 607 F.2d 847, 850 (9th Cir. 1979), discussed “reasonable suspicion” as mentioned in Terry [v. Ohio, 392 U.S. 1 (1968),] and stated:
“““[T]he quantum of cause, necessary to justify an investigatory stop is a “reasonable” or “founded” suspicion that the person has committed or is about to commit a criminal act.... The founded suspicion must arise from specific facts and not inchoate hunches, but the officer is entitled to draw., inferences from those facts in light of his, experience.””,
“Gaskin v. State, 565 So.2d 675, 677 (Ala.Cr.App.1990) (emphasis added). When evaluating whether reasonable suspicion for a stop exists, we require that the police officer be able to
“ ‘ “point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. Terry v. Ohio. ... The appropriate *505 question to ask is ‘... [W]ould the facts available to the officer at the moment of the seizure or the search “warrant a man of reasonable caution in the belief’ that the action taken was appropriate?’. Terry v. Ohio, ... Daniels v. State, 290 Ala. 316, 276 So.2d 441 (1973).”
“.‘Sterling v. State, 421 So.2d 1376, 1379 (Ala.Cr.App.1982),
“Gaskin, 565 So.2d at 677. a
“... ■ [T]he law does not require that the appellant be engaged in illegal activity before an officer may make an investigative stop.
“ í a relevant inquiry in evaluating the presence of reasonable suspicion is “ ‘not whether particular conduct is “innocent” or “guilty,” but the degree of suspicion that attaches to particular types ■ of. non-criminal acts.””” State v. Washington, 623 So.2d at 397 (quoting United States v. Tapia, 912 F,2d 1367, 1370 (11th Cir. 1990)) (quoting United States v. Sokolow, 490 U.S. 1, 10, 109 S.Ct. 1581, 1587, 104 L.Ed.2d 1 (1989), and Illinois v. Gates, 462 U.S. 213, 243-44 n. 13, 103 S.Ct. 2317, 2334-35 n. 13, 76 L.Ed.2d 527 (1983)).’
“Hopkins v. State, 661 So.2d 774, 782 (Ala.Cr.App.1994). When reviewing the degree of suspicion that attaches to noncriminal behavior, courts should give great deference to the training and experience of police officers.' This court has noted that ‘“[w]hile many factors which can contribute to a reasonable suspicion of criminal activity are subject to a variety of interpretations, it is the experience of an officer that allows him to bring the factors together into a meaningful whole demonstrating reasonable suspicion of criminal activity.” ’ Id. at 779 (quoting 2 W. Ringel, Searches and Seizures, Arrests and Confessions 13.4(a) (2d ed.1994)).”
Williams v. State, 716 So.2d 753, 755-56 (Ala.Crim.App.1998). Further,
“ ‘[w]hile an officer may rely upon a police radio broadcast to stop and arrest a suspect, the subsequent determination by any court as to whether probable cause [or reasonable suspicion] existed must turn on all the underlying circumstances giving rise to the police dispatch.’ Pickett v. State, 417 So.2d 589, 593 (Ala.Cr.App.1982).”
Bryant v. City of Gadsden, 574 So.2d 919, 921 (Ala.Crim.App.1990). The dispatch that an angry parent was on the way to the high school with a shotgun was based on information received from the principal of Athens High School who had just received a telephone call in which the caller, who identified herself as Mrs. Smoak — the parent of a child disciplined at the school earlier in the morning — frantically informed the principal that her husband, Smoak, was angry, that he had a shotgun, and that he was currently on his way to the school driving a beat-up blue Nissan van. The dispatch and the principal’s information was corroborated when Smoak approached the school in a beat-up blue Nissan van within five minutes of Mrs. Smoak’s telephone call and the subsequent dispatch. Further corroboration was what appeared to be Smoak’s two evasive maneuvers at the school to avoid encountering the officers (one in front of the school and one behind the school). Based on the totality of the circumstances, the facts were sufficient to establish reasonable suspicion for officers to stop Smoak’s vehicle to investigate possible criminal activity. After stopping the vehicle, police observed a shotgun in plain sight on the front seat of Smoak’s vehicle. “The ‘plain view’ exception to the warrant requirement authorizes the warrantless seizure of person *506 al property where the initial intrusion is lawful, the discovery of the property is inadvertent, and the incriminating nature of the property is immediately apparent.” Lykes v. State, 709 So.2d 1335, 1336 (Ala. Crim.App.1997). Therefore, under the plain-view exception to the warrant requirement, officers properly seized the shotgun and had probable cause to arrest Smoak for possession of a deadly weapon with intent to do bodily harm on the premises of a school.
'IV.[10]
Smoak- contends that the trial court erred when it denied his motion for á mistrial based on the State’s creating an inference that Smoak’s post-arrest silence was evidence of his guilt.
“ ‘A mistrial is a drastic remedy that should be used sparingly ’and only to prevent manifest injustice.’ Hammonds v. State, 777 So.2d 750, 767 (Ala.Crim. App.1999) (citing Ex parte Thomas, 625 So.2d 1156 (Ala.1993)), aff'd, 777 So.2d 777 (Ala.2000). A mistrial is the appropriate remedy when a fundamental error in a trial vitiates its result. Levett v. State, 693 So.2d 130, 135 (Ala.Crim.App. 1991).' ‘The decision whether to grant a mistrial rests within the sound discretion of the trial court and the court’s ruling on a motion for a mistrial will not be overturned absent a manifest abuse of that discretion.’ Peoples v. State, 951 So.2d 755, 762 (Ala.Crim.App.2006).”
Peak v. State, 106 So.3d 906, 915 (Ala. Crim.App.2012).
Floyd Johnson, the Chief of Police of the City of Athens, was away from the police station when he was informed that there had been an incident at the high school. He returned to the police station where,’ he testified, he “observed [Smoak]' in the booking room and talked with him for a few moments.” (R. 506.) The following then occurred.
“Q. [Prosecutor:] Did you have an occasion to speak to [Smoak]?
“MR. TOTTEN: Objection.,. I object to that. The proper predicate has not been laid.
“THE COURT: Well, I’ll allow that question. Overruled.
“(MR. JONES CONTINUED)
“Q. Did you have an occasion to. speak to him?
‘‘A. Yes, sir, I did.
“MR. TOTTEN: I would like a continuing object. No foundation has been laid that this guy is in custody. We would ask that this be disregarded as improper.
“MR. JONES: We’re not asking what he said.- I’m just asking him did he speak to him. ■
“THE COURT: At this point in time it’s not objectionable. I’ll overrule it.
“(MR. JONES CONTINUED)
“Q. Did you speak to him?
“A. Yes, sir.
“Q. Did you have an occasion to take a formal statement from [Smoak]?
“MR. TOTTEN: Judge, can I take the witness, on voir dire?
“THE COURT: Yes, sir.
“MR. TOTTEN: And, Judge, I think it would be proper'to do this outside the presence of the jury.
“THE COURT: You want the voir dire outside the presence of the jury?
“MR. TOTTEN:' Yes, sir.
*507 “THE COURT: All right. Jury, if /all will be excused, please. You will be in recess and we will continue in here.”
(R. 506-508.)
Before taking the witness on voir dire, Smoak moved for a mistrial on the ground that the State had impermissibly attempted to get the jury to infer that Smoak had refused to give the police a statement, which attempt, he says, violated his Fifth Amendment right to remain silent. The motion for a .mistrial was denied, with the trial court stating: .•
“[T]he fact that he asked him, ‘Did you ask him to make a statement,’ is not prejudicial, it’s not grounds for a mistrial, it’s not even objectionable.”
(R. 511.) The defense then questioned Chief Johnson on voir dire, asking him if he had read Smoak his Miranda rights, to which Johnson answered, “I don’t believe! did.” (R. 513.) The defense then argued that because Smoak was in custody and had not been advised of his Miranda-rights, “[there cannot] be any inference'as to questions or any non-questions.” (R. 513-14.)
Contrary to Smoak’s argument, the record, as quoted above, does not disclose that Chief Johnson testified that Smoak refused to give a statement. There is no merit to this argument; thus,. the trial court did not abuse its discretion when it denied Smoak’s motion for a mistrial.

Conclusion

Based on the above, we reverse Smoak’s conviction for making a terrorist threat and render a judgment of acquittal on that charge. Smoak’s conviction for. possession of a deadly weapon with intent to do bodily harm on the premises of a school is .affirmed.
AFFIRMED. IN PART; REVERSED IN PART; AND JUDGMENT RENDERED.
WINDOM; P.J., and BURKE, J., concur.
KELLUM and JOINER, JJ., concur in the result.

. Patrick’s offense occurred during final examinations at the end of the school year. Mrs. Smoak was called when Patrick finished his last examination. His punishment for his infraction was to be a five-day suspension at the beginning of the next school year.

. Smoak presented seven issues for appellate review. Issues three, five, and six challenge his terrorist-threat conviction. Because this Court is reversing that conviction and rendering a judgment for Smoak, those issues will not be addressed.

. Count I of the indictment charged Smoak with making a terrorist threat as follows:
“THOMAS BRIAN SMOAK, whose name is otherwise unknown to the Grand Jury, did, on or about May 25, 2010, threaten by any means to commit any crime of violence, or to damage any property by causing the disruption of school activities, to-wit; caus- *498 'tag a lock down of Athens High School due to the fact of entering school grounds with a loaded shotgun after stating that he was 'mad at school officials about the handling of a disciplinary situation with his son, in violation of Section 13A-10-15 of Ae Code of Alabama_” .
(C. 60.) The indictment was amended at trial, over defense objection, to add Ae mens rea element that Smoak acted recklessly.

. However, a year later, in P.J.B. v. State, 999 So,2d 581 (Ala.Crim.App.2008), P.J.B. told his school-bus driver that he wanted to burn a public com maze that had no connection to his school. His school-bus driver told his school principal. P.J.B. was adjudicated a delinquent based on making a terrorist threat. This Court reversed P.J.B.’s delinquency adjudication because the element of disrupting school activities was not proven. Whether P.J.B.’s comment was an actual threat and whether a third person can relay a threat were not issues in that appeal and thus were not specifically discussed,

. It is a .terrorist threat to disrupt school activities when the disruption is based on knowledge or fear of impending harm.

. See Commonwealth v. Kidd, 296 Pa.Super. 393, 397, 442 A.2d 826, 827 (1982)("The record evinces that his conduct expressed transitory anger rather than a settled purpose to carry out the threat or to terrorize the other person, His acts did not involve the sort of conduct that the Legislature intended to deter and punish_" as a terrorist threat.).

. What the evidence reflects, is more akin to criminal negligence — Smoak should have perceived, but failed to perceive, that his conduct *501 would cause fear resulting in the lockdown of the school. See § 13A-2-2(4), Ala.Code 1975.'

. This issue was argued as issue 3 of Smoak's brief. In issue 3, Smoak also argued that the Confrontation Clause was violated. ‘ This Court agrees with the State's assertion that the telephone call was not testimonial in nature and, thus, that it did not implicate the Confrontation Clause. See Crawford v, Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

. Issue 4 in Smoak’s brief.

. This is issue VII in Smoak’s appellate briéf.